IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No. 22-cr-100-RBW |
| v. | : | |
| JACOB L. ZERKLE, | : | |
| *Defendant*. | : | |

## DEFENDANT'S MOTION TO CHANGE VENUE

Jacob L. Zerkle, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), respectfully requests that this Court move his trial outside the District of Columbia (D.C.).[1] Recent venue data reveals an overwhelming presumption of guilt among prospective D.C. jurors as to January 6 related defendants than adults surveyed both nationwide, as well as, in a demographically comparable federal court division. In light of this data, the characteristics of the D.C. jury pool, and the impact of sustained and provocative media coverage in D.C., transfer out of this district is the only way to protect Mr. Zerkle's constitutional rights to due process and a fair trial.

### ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. U.S. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is so fundamental to Due Process that when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must*

---

[1] Mr. Zerkle, through counsel, acknowledges that district judges in this Court have considered similar arguments and denied the instant motion in other January 6 related matters. However, the D.C. Circuit and the Supreme Court have not addressed this issue.

transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of a venue is so severe that there can be "a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). If the defendant demonstrates that "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial," then "the court must transfer the proceeding . . . to another district." Fed. R. Crim. P. 21. As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide trial and appellate courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[2] *Skilling*, 561 U.S. at 378.

Where presumption of prejudice attaches, the Supreme Court has further recognized that it overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Florida*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *See Rideau v. Louisiana*, 373 U.S. 723,

---

[2] Though not relevant to the instant motion, the Supreme Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. *Skilling*, 561 U.S. at 383.

2

727 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, *voir dire* is not a cure for significant and substantiated Due Process concerns about the jury pool.

Mr. Zerkle respectfully submits that each of the three *Skilling* factors compels transfer of venue in this case.

I.  **The Survey Data, Size, and Characteristics of the Prospective Jury Pool Demonstrate That the Presumption of Juror Prejudice Attaches.**

The foundation for the presumption of prejudice is found in the Supreme Court's decision in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed for a finding of prejudice was that half of the small jury pool had been exposed to prejudicial media — a widely-circulated video of the defendant's confession. *Id.* at 726. Despite *voir dire* revealing that only three seated jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that the video tainted was significant enough to render the defendant presumptively prejudiced. *Id.* at 725. In applying *Rideau*, many courts have focused on population size and diversity as a proxy for the population's share that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal: because Houston is the fourth-largest city in the United States and highly diverse, a significant number of prospective jurors would lack any connection to Enron. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

Three elements of Mr. Zerkle's case distinguish it from *Skilling*, 1) the size and demographics of D.C., 2) the unprecedented impact of the event of January 6 on D.C. and its residents, and 3) the steady drumbeat of pre-trial publicity. Therefore, this case more closely

3

parallels the presumptively prejudicial circumstances in *Rideau*. Indeed, survey data confirms the conclusion that Mr. Zerkle will not be able to assemble a fair and impartial jury as the Constitution requires.

> **A.    Survey Data Supports the Attachment of Prejudice.**

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for D.C. retained the services of the professionals of Select Litigation to survey the D.C. jury pool. As explained in Exhibit 1, Select Litigation polled 400 potential D.C. jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, with appendices. A second survey, attached as Exhibit 2 was conducted by defendants Thomas Caldwell and Connie Meggs in criminal case no. 21-cr-028 before the Honorable Amit P. Mehta. *See United States v. Caldwell*, 21-cr-028 (APM) (D.E. 654-1) (attached hereto as Exhibit 2). These two surveys lead to the inescapable conclusion that prejudice has attached to the D.C. jury pool.

> **(i)    A Majority of Potential Jurors Have Prejudged the January 6 Defendants.**

Both surveys of D.C. potential jurors shows that significant majorities have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.

Exhibit 1 summarizes Select Litigation's findings, but highlights include that D.C. residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations (84%); and

- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54%

4

respectively).

Ex. 1 ¶¶ 9, 14. These results illustrate a burden that a D.C. jury pool will place on Mr. Zerkle — to prove that he is not a member of such groups. The survey indicates that most of the jurors will be predisposed against Mr. Zerkle, will likely view him as guilty of conduct other than that with which he is charged, and will likely consider him as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence that he committed the crimes charged.

Significant majorities also:

- would characterize these individuals as "criminals" (62%); and
- have already formed the opinion that these individuals are people "guilty" of the charges brought against them (71%).

Ex. 1 ¶¶ 14, 10. Again, the results indicate that the D.C. jury pool will transfer the burden to Mr. Zerkle.

Despite jurors' well-known duty not to determine guilt before hearing the evidence, over half of D.C. respondents admit that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). Ex. 1 ¶ 11.

Equally alarming, one-third of D.C. respondents would not trust a D.C. jury to give them a fair trial if they were accused of violating the law on January 6th. *See* Ex. 1 ¶ 8 (reporting that only 67% of potential D.C. jurors stated that they believe that they personally would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that the January 6 defendants *can* get a fair trial is suspect. Of those who believe that January 6 defendants can get a fair trial in D.C., 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of this group confess that they would be more likely to vote "guilty" if they were on a jury. *Id.* Exhibit 2 exposes similar results.

Indeed, 91% of the D.C. respondents who answered the "pre-judgment test questions" admitted to making at least one prejudicial prejudgment. Ex. 2 at 2.

The study commissioned by defendants Caldwell and Meggs reveal similar results. In that survey, 85% of the D.C. respondents characterized the events of January 6 as criminal in nature, even when given the option to reserve judgment on that question. Seventy-two percent of the respondents said that they are likely to find the defendants guilty, even when given the choice "it is too early to decide." Ex. 2 at 2. The survey also demonstrates that the bias is far more prevalent among D.C. respondents than the three other judicial districts surveyed.

The survey data reveals that overwhelming majorities of D.C. respondents have already concluded that those who went to the U.S. Capitol on January 6 were acting with the intent to obstruct an official proceeding and/or cause civil disorder, one of the charges in which Mr. Zerkle has been charged with in this case. They have concluded that these defendants were:

- trying to overturn the election and keep Donald Trump in power (85%);
- insurrectionists (76%); and/or
- trying to overthrow the United States government (72%).

Ex. 1 ¶¶ 15, 18.

Likewise, the Caldwell-Meggs survey reveals that 71% of D.C. respondents believe that all who entered the Capitol without authorization planned in advance to so, even when offered options to reserve judgment on that question. Ex. 2 at 4. The median response of all the districts surveyed to that question was 49%. *Id.* Thus, not only have most D.C. respondents reached the broader conclusion that these individuals are "guilty," but the vast majority have prejudged an element essential to several charges in the case.

This is the type of pernicious bias that a typical *voir dire* would not reveal, as *voir dire*

usually does not entail inquiring into jurors' ideas about each element of the charged offenses. Asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J. concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.").

That is the case here: many who expressed confidence that January 6 defendants can obtain a fair trial have already prejudged an essential element in the case. That is, 78% of those in the survey who say that they believe the defendants will receive a fair trial also take it as a given that defendants who entered the building were trying to overthrow the government and/or to keep Donald Trump in power. Ex. 1 ¶ 16.

This survey answer should, at a minimum, require the Court to itself *voir dire* potential jurors and to allow attorney-conducted *voir dire* about this issue. However, even that solution is constitutionally insufficient. Unless the *voir dire* probes every element of each charged offense, these results show that *voir dire* cannot be expected to preserve Mr. Zerkle's right to an impartial jury in this District.

      **(ii)**    **Survey Results from the Northern District of Georgia are Powerful Evidence that District Residents are Particularly Unlikely to Be Impartial.**

Select Litigation's study also reinforces that this District is perhaps uniquely unlikely to produce an impartial jury. There is no place like D.C. It is one of the least populous federal court divisions. A significant share of its population is employed by the federal government. The ratio of Biden to Trump supporters in 2020 was more lopsided than in any other federal judicial division.

*Id.* ¶ 22. These unique attributes lead to the conclusion that the January 6 defendants cannot assemble an impartial jury in D.C. Select Litigation's data confirms this. Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to D.C. Ex. 1 ¶¶ 19-23. The results show that significantly fewer potential Atlanta jurors have set their minds against January 6 defendants. For example:

- 84% of D.C. survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;

- 71% of D.C. respondents believe that these individuals are guilty, but only 54% of Atlanta division respondents share this opinion;

- More than half of D.C. respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;

- 62% of D.C. respondents characterize the January 6 defendants as "criminals," and well over 50% characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

Ex. 1 ¶¶ 23, 24.

Finally, the evidence suggests that jurors in other districts resemble Atlantans more than D.C. residents. Select Litigation asked both sets of survey respondents to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent national poll recently conducted by CBS/YouGov. Ex. 1 ¶¶ 3, 18, 25.[3] The results show that potential jurors in Atlanta hold prejudicial views on this issue at similar rates as survey respondents do nationally. *Id.* ¶ 25. But a far greater share of D.C.'s potential jurors hold

---

[3] The results of the poll are reviewed at https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited February 9, 2023). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. *See* Ex. 1 ¶ 18.

prejudicial views on this issue.

| Comparison of Beliefs among Jury-eligible Citizens in D.C. & Atlanta Division, & adults nationwide | | USA | D.C. | GA |
|---|---|---|---|---|
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 84% | 68% |
|  | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
|  | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
|  | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
|  | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
|  | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
|  | Would not | 72 | 86 | 70 |

### B. The Size and Makeup of the D.C. Jury Pool Ensures That Prejudice Has Attached.

The District of Columbia is a compact major U.S. city and the smallest federal district in the nation. Counsel respectfully submits that, due to the district's unique characteristics, prejudice has attached.

First, the government and the media have labeled the events of January 6 as an attempt to overthrow the government — and an attack on democracy itself.[4] As the Court is aware, a large

---

[4] *See, e.g.*, Kevin McCoy & Kevin Johnson, *Investigators Signal Some Capitol Riot Suspects Could Be Charged with Conspiring to Overthrow U.S. Government*, USA Today, (Feb. 19, 2021), https://www.usatoday.com/story/news/2021/02/19/capitol-riot-did-conspirators-try-overthrow-u-s-government/6750393002/; *see also The January 6 Attack on the U.S. Capitol*, American Oversight (Jan. 5, 2022), https://www.americanoversight.org/investigation/the-january-6-attack-on-the-u-s-capitol ("Trump supporters having for weeks discussed openly their plans for a violent overthrow.").

proportion of D.C. residents either work for the federal government themselves or have friends or family who do. As of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater D.C. area (not including postal workers, F.B.I. employees, and staff on several federal commissions).[5] Nearly 190,000 of those workers and annuitants work within D.C. itself. *Id*. With a total population of around 690,000,[6] it seems clear that any given member of the district's jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the D.C. Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in D.C. itself.[7] This does not include the many retired and former federal employees living in D.C.

Importantly, nearly 15,000 D.C. metro area residents work for Congress directly, each of whom have friends and family in D.C.[8] Many others have friends and family in law enforcement that responded to the Capitol on January 6.[9]

---

[5] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

[6] District of Columbia Population – April 1, 2020, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/washingtoncitydistrictofcolumbia,US.

[7] *Trends in Federal Employment in DC*, DC Pol'y Ctr. (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[8] *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[9] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*, U.S. Cap. Police 1, 12 fig. 5 (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National

In sum, an enormous share of D.C. residents has connections with the federal government and other institutions that were affected by January 6. The quantity of such connections is unlikely to be present in any other district. Because the government and much of the media have characterized the events of January 6 as an attack on our elections, government institutions, and democracy as a whole, a disproportionate number of D.C. residents are more likely to view themselves as the direct victims of the events.

Moreover, even D.C. residents not employed by the government report feeling deeply traumatized by the events that took place so close to where they live and work. For example, one D.C. resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[10]

---

Guard. *See Metropolitan Police Force Annual Report 2020*, Gov't D.C. Metro. Police Dep't 32 (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf; *see also About Us*, DC Nat'l Guard (last visited Apr. 23, 2022), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. While not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. Celine Castronuovo, *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021, 11:01 AM)), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

[10] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC Radio (Jan. 7, 2021, 5:45 PM), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

In interviews in the days following January 6, the D.C. Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[11] The Metropolitan Police Department and over 25,000 military personnel occupied D.C. neighborhoods in the weeks that followed.[12] Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Some residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[13]

As the Court is no doubt aware, the effects of these events continue to be felt in D.C. Prior to protests to support detained January 6 defendants planned for September 2021, the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors."[14]

---

[11] Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today, Gov't D.C. Muriel Bowser, Mayor (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days, Gov't D.C. Muriel Bowser, Mayor (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, DC Mayor Says Americans Should Not Come to Washington for the Inauguration, Washingtonian (Jan. 11, 2021) (noting the many street closures), https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[12] Ellen Mitchell, Army: Up to 25,000 National Guard in DC for Biden Inauguration, The Hill (Jan. 15, 2021, 3:55 PM),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[13] Jenny Gathright & Rachel Kurzius, What It Feels Like to Live Under D.C.'s State of Emergency, DCist (Jan. 13, 2021 12:27 PM), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

[14] Associated Press, In Edgy Washington, Police Outnumber Jan. 6 Protesters, US News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters

Further, an overwhelming number of D.C. residents — over 92 percent — voted for President Biden.[15] According to the government's theory of the case, many of those who came to the Capitol in connection with January 6 acted to prevent Joseph Biden from becoming President. Again, this stark political divide (and impact on juror attitudes) would not be present as uniformly in a different jurisdiction.

Finally, the government, the media, and judges in this division speak of these prosecutions as designed to prevent "another January 6."[16] As such, D.C. residents as jurors are highly likely to view Mr. Zerkle not only as someone who victimized them, but also as someone who might victimize them again, raising a concern about conviction for prevention rather than Mr. Zerkle rather than individual guilt.

The survey results, size, and characteristics of the D.C. jury pool make clear that prejudice has attached, and that Mr. Zerkle cannot obtain a fair and impartial trial here.

C. **Media Coverage in the District also Prejudices Mr. Zerkle.**

The Sixth Amendment guards against jurors' conclusions being induced by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling*, 571 U.S. at 378

---

[15] General Election 2020: Certified Results, DC Bd. Elections (Dec. 2, 2020, 11:26 AM), https://electionresults.dcboe.org/election_results/2020-General-Election.

[16] *See*, *e.g.,* Zachary B. Wolf, These Republicans Are Worried About Trump's Attempted Coup 2.0, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html; see also Jordan Fischer et. al, 'Resolving the crime of the century with misdemeanors' | Judge Skewers DOJ At January 6 Sentencing, WUSA9 (Oct. 28, 2021, 2:47 PM), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae (explaining that the sentence was designed to alert "others who might consider attacking the Capitol to know their punishment would 'hurt.'"),

(quoting *Patterson v. Colo. ex rel. Att'y Gen.*, 205 U.S. 454, 462 (1907)) (emphasis added). That outside influence can be "public print" *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id.* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"). The improper outside influence may be the *nature* of the media to which jurors have been exposed, or its prevalence close to the time of the trial, or its tendency to provoke identification with those directly affected by the conduct at issue such that the jurors feel a personal stake in the outcome. *See Skilling*, 561 U.S. at 372 (discussing broadcast of confession in small town in *Rideau*, 373 U.S. 723); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla. 1996). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

Like the pretrial publicity in *Rideau* that led the Supreme Court to rule that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has "invited prejudgment of . . . culpability," and been of the "smoking gun variety." *Skilling*, 561 U.S. at 383.[17] In *Rideau*, the Court concluded that no *voir dire* could cleanse the taint of a video of the

---

[17] In *Skilling v. United States*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the district, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial. *Skilling*, 561 U.S. at 382-83; *id.* at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6 and hundreds of pictures of those events.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated over the last 15 months capture many of the alleged crimes themselves. *Skilling*, 561 U.S. at 382-83. Vivid images splashed across D.C. papers and television for the last fifteen months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on congressional desks, hanging from the balconies in the Senate Chamber, and trying to break into the House chamber, among hundreds of other scenes. Many of the images are "likely imprinted indelibly in the mind of anyone who [viewed them]," just like the recorded interrogation in *Rideau* would have been. *See Skilling*, 561 at 382-83. Most, if not all, of this evidence has nothing to do with Mr. Zerkle or this prosecution, but because D.C. jurors have been inundated with these videos, they cannot be expected to "shut [them] from sight" during trial. *See Skilling*, 561 U.S. at 382.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and distinguishable from the type of press coverage that failed to convince the Supreme Court in *Skilling*. 561 U.S. at 382-83 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking-gun variety" and was not so shocking that it could not be shut from jurors' minds during trial). Attached as Exhibit 3 is a list of news articles and media available to residents of Washington, DC relating to the events of January 6, 2021.[18]

---

[18] This general media relating to January 6, 2021 is separate and apart from the media specific to Mr. Zerkle, which began with the Government's press release as to Mr. Zerkle's arrest (*see* https://www.justice.gov/usao-dc/pr/arizona-man-arrested-charges-assault-law-enforcement-

15

Moreover, data gathered by News Exposure establishes that coverage of January 6 has been extensive and persistent, particularly in D.C. In one year, D.C. newspapers published at least 500 articles about January 6, and local news syndicates broadcast over 7000 stories about the day. Ex. 1 at App. B-7 (print data); App. B-1 (broadcast data). This coverage is far more extensive and contemporaneous than that in *Skilling.* 561 U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between Enron's collapse and trial for there to accumulate hundreds of *Houston Chronicle* articles, and 1,600 local broadcast stories about Skilling).

News Exposure also analyzed coverage of January 6 in the Northern District of Georgia's Atlanta Division. Ex. 1 ¶¶ 27-32. Comparison of coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in D.C. The lowest month of January 6 coverage in D.C. still surpassed January 6 coverage in 9 out of 12 months in Atlanta. Ex. 1 ¶ 30; *id.* at App. B-1, B2 (August, 2021 in D.C. had the lowest coverage of January 6 and, even then, it surpassed Atlanta's coverage in all but 3 months of the study.). The data also shows that D.C. print, broadcast, and web coverage of January 6 has exceeded Atlanta's equivalent's almost every month and has

---

during-jan-6-capitol-breach, last visited February 10, 2023) and a separate page on DOJ's website devoted specifically to Mr. Zerkle (*see* https://www.justice.gov/usao-dc/defendants/zerkle-jacob, last visited February 10, 2023), and now includes numerous media articles written specifically about Mr. Zerkle. *See* https://www.azcentral.com/story/news/local/arizona-breaking/2022/03/15/arizonan-jacob-zerkle-arrested-shoving-officers-during-capitol-riot/7049981001/, last visited February 10, 2023, https://tucson.com/news/local/crime-and-courts/southern-arizona-man-faces-charges-in-jan-6-riot/article_f38e6732-a4b0-11ec-887d-736e4898c7c3.html, last visited February 10, 2023, https://www.businessinsider.com/man-accused-of-assaulting-officers-arrested-on-capitol-riot-charges-2022-3, last visited February 10, 2023; https://gilaherald.com/feds-arrest-bowie-man-for-actions-during-january-6-capitol-riot/, last visited February 10, 2023, https://www.abc15.com/news/local-news/arizona-man-jacob-zerkle-arrested-for-assaulting-officers-during-january-6-capitol-riots, last visited February 10, 2023; https://www.fox10phoenix.com/news/arizona-man-allegedly-pushed-and-tried-to-punch-d-c-police-officers-during-deadly-capitol-riot-officials-say, last visited February 10, 2023.

far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post.* Ex. 1 ¶ 28.[19]

In short, the data shows that for more than 15 months, D.C. residents have been exposed to constant coverage of January 6 and more coverage than residents of a comparable district. Consequently, Mr. Zerkle will be unable to seat an impartial jury in this district.

## II. Transferring this Case is the Only Way to Safeguard Mr. Zerkle's Constitutional Right to an Impartial Jury.

The Supreme Court has recognized certain conditions that make it more difficult for a juror to accurately assess their own bias or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine that in that case "due process of law . . . required a [transfer]"); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire*] is often its father.").

The presumption of juror prejudice here stems from the small size of this district, its many federal employees, the aftermath of January 6, the political makeup of D.C. coupled with the government's theory of the case — which make this venue uniquely unlikely to produce an impartial jury. Data confirms extremely high levels of prejudice among potential jurors in this district, whether due to the factors above, particularly high levels of pretrial publicity, or a combination. Most potential D.C. jurors have already made up their minds that the January 6

---

[19] Again, the Caldwell-Meggs survey supports the results of the Select Litigation Survey. Only 4.83% of District respondents said they "never or almost never" follow news coverage as opposed to 13.4% in the Eastern District of Virginia. Ex. 1, fig. 6.

17

defendants are criminals. Many do not realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire* and to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal.

Under these extreme circumstances, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Zerkle's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21 of the Rules of Criminal Procedure. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the *Skilling* case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

Mr. Zerkle is scheduled for trial on June 12, 2023. As of this filing, numerous January 6 defendants have already been convicted on all counts by D.C. juries. By June, more January 6 defendants will have gone to trial. Media outlets will continue the constant coverage of trial proceedings, guilty pleas, verdicts, and sentences. The already-small pool of potentially eligible jurors will shrink, and pretrial publicity will continue to erode potential jurors' impartiality. As such, the reasons for the Court to presume prejudice will only grow between now and Mr. Zerkle's trial. To ensure that Mr. Zerkle's trial proceeds as scheduled, and that he is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

## CONCLUSION

Because each of the *Skilling* factors weigh in favor of finding a presumption of prejudice, Mr. Zerkle respectfully requests that the Court transfer the case outside of the District of Columbia and across the river to the closest U.S. District Court, the Eastern District of Virginia.[20]

Dated: February 10, 2023          Respectfully submitted,

　　　　　　　　　　　　　　　　　　 /s/ Christopher Macchiaroli
　　　　　　　　　　　　　　　　Christopher Macchiaroli (D.C. Bar No. 491825)
　　　　　　　　　　　　　　　　Silverman, Thompson, Slutkin & White LLC
　　　　　　　　　　　　　　　　1750 K Street, NW, Suite 810
　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　Telephone: (202) 539-2444
　　　　　　　　　　　　　　　　Facsimile:  (410) 547-2432
　　　　　　　　　　　　　　　　Email: cmacchiaroli@silvermanthompson.com

　　　　　　　　　　　　　　　　*Counsel for Defendant Jacob Zerkle*

---

[20] In the alternative, Mr. Zerkle would request expanded examination of prospective jurors, including a juror questionnaire and expanded opportunity for *voir dire*.