# Exhibit 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 21-cr-689
 4                   Plaintiff,      )
                                     ) SENTENCING HEARING
 5    vs.                            )
                                     ) Washington, DC
 6    Thomas Patrick Hamner,         ) September 23, 2022
                                     ) Time:  9:30 a.m.
 7                   Defendant.      )
      _____
 8
                   TRANSCRIPT OF SENTENCING HEARING
 9                         HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                 UNITED STATES DISTRICT JUDGE
      _____
11
                       A P P E A R A N C E S
12
      For Plaintiff:      Douglas Collyer
13                        DOJ-USAO
                          Gateway Building
14                        14 Durkee Street, Room 340
                          Plattsburgh, NY
15                        (518) 314-7818
                          Email:  Douglas.collyer@usdoj.gov
16
      For Defendant:      Nicholas Smith
17                        David B. Smith, PPLC
                          1123 Broadway
18                        Townsend Building, Suite 909
                          New York, NY  10010
19                        (917) 902-3869
      _____
20
      Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
21                            Official Court Reporter
                              United States Courthouse, Room 6523
22                            333 Constitution Avenue, NW
                              Washington, DC  20001
23                            202-354-3267

24

25
```

 1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2     This morning we have criminal case No. 21-689, the *United*

 3     *States of America v. Thomas Patrick Hamner*.  The defendant is

 4     present and in the courtroom, Your Honor.  The probation

 5     officer present for these proceedings is Mr. Robert Walters.

 6          Will counsel for the government just make sure he has a

 7     little green light, reach into his microphone and identify

 8     himself for the record.

 9          MR. COLLYER:  Good morning, Your Honor.  Douglas

10     Collyer for the United States.

11          THE COURT:  Good morning.

12          THE COURTROOM DEPUTY:  Counsel for the defendant.

13          MR. SMITH:  Good morning, Judge.  Nick Smith for

14     Thomas Hamner.

15          THE COURT:  All right.  Good morning.  And I note

16     Mr. Hamner is present and appears to have some -- possibly some

17     family members present as well.  And I'm glad that they're here

18     to support you.

19          We're here this morning for Mr. Hamner's sentencing.  He

20     pled guilty -- not pursuant to any kind of plea agreement -- to

21     Count 2, and only Count 2 of the indictment, and he's to be

22     sentenced on that count.

23          Pursuant to the parties' joint status report, any

24     assessment of the impact of this guilty plea on the

25     government's determination as to how to proceed on the

1    remaining counts is going to be made after today's hearing, in

2    accordance with a schedule I'll set before we adjourn.  But

3    those counts are not before us today.

4          I want to note, in the event there are any members of

5    the press or the public listening in on the public line, you

6    have an absolute right to attend and report on what transpired

7    during court proceedings, but the recording and dissemination

8    of a recording of these proceedings would be a violation of our

9    court rules.

10          The final presentence report in this case was filed on

11   September 1st.  I'm aware that you've filed many comments, but

12   I want to make sure, Mr. Smith, that you both you and Mr.

13   Hamner have had an opportunity to read the presentence report.

14          MR. SMITH:  Yes, Your Honor, we have.

15          THE COURT:  And I realize there were some issues as

16   to how to credit certain -- in particular, a criminal case and

17   how to apply the guidelines.  But with respect to the facts set

18   forth in the plea agreement in the sentencing report, are there

19   any disputes?

20          MR. SMITH:  No, Your Honor, not except for the ones

21   that the probation office reflected in the objections.

22          THE COURT:  All right.  With those noted, then, I'm

23   going to accept the presentence report as undisputed, except

24   for the places where there are objections noted, and as part of

25   my findings of fact at sentencing.

1           And I don't believe there's any legal disputes we have

2      to resolve, other than how the guidelines should be applied; is

3      that correct?

4           MR. SMITH:  Correct, Your Honor.  Thank you.

5           THE COURT:  So I've read the presentence report, but

6      that's not all I've read.  I've received additional materials

7      concerning the defendant, including the government's memorandum

8      in aid of sentencing, and attaching an FBI 302 memorializing

9      one officer's experience during the incident that's at the

10     heart of this case.

11          I've read the defendant's memorandum in aid of

12     sentencing, which had a number of attachments, including a very

13     heartfelt letter from the defendant's wife regarding his

14     character and the ongoing impact of his incarceration on their

15     family, their business, and their children.  It also documents

16     the defendant's attempts to resolve an outstanding warrant in

17     California before his arrest in this case.

18          I read and received a series of character references

19     that appear to have been generated in 2019 in connection with

20     another purpose, with respect to either work or attendance at a

21     service academy with respect to government contracts.  I'm not

22     sure if the authors are aware of their use for the purposes for

23     which they're being supplied now, but I will take into

24     consideration what it is that people who knew you and worked

25     with you in the past had to say then.

1    They noted the defendant's professionalism, his

2    trustworthiness, and his work ethic; called him a man of

3    integrity and ethics at his business, dependable, knowledgeable

4    and hard working, he plainly knows his trade.  They were

5    uniformly satisfied with the quality of the finished product

6    and the standards of excellence that he lived up to.  They

7    describe him as detail-oriented, confident, punctual, somebody

8    who connected well with other people, and was described as

9    someone who delivers on what he promises.  And he's somebody

10   that you'd want on your side if events, as one person put it,

11   went south.

12       There were a few letters from 2021, which were a little

13   bit more relevant, that had been offered, I guess, in support

14   of the defendant's release from pretrial detention.  An

15   accountant or someone who'd worked with him in his business

16   remarked on how well Mr. Hamner insists on treating his

17   employees and the importance of his continued role in the

18   company to provide work for those employees and how he supports

19   the families of the employees, as well as his own family.

20       Another person who he met through public forums and his

21   church described him as warm and gregarious, generous with his

22   time in supporting candidates in his community and educating

23   his community.

24       The reason I go through this in so much detail is I want

25   everybody to know I really do read and consider these letters

1    and I appreciate them all.

2         In a criminal case there's a statute that tells me how

3    I'm supposed to decide what the sentence is, it's 18 U.S. Code

4    § 3553.  It list a number of factors that I'm going to go

5    through one at a time later.  But the advisory sentencing

6    guidelines and what they would recommend as a sentence is one

7    of the factors I have to consider in determining the

8    appropriate sentence here.  I'm required to calculate what they

9    would recommend in every case.  And the purpose of them is to

10   arrive at a recommended sentencing range based on the offense

11   and then various aggravating and mitigating factors.

12        So I'm going to begin with that calculation.  It might

13   sound more like math than law as I go through it, but I want

14   everybody to understand that that's only the initial part of

15   the analysis.

16        The defendant pled guilty to Count 2, which alleges that

17   on or about January 6, at about 1:40 p.m., Mr. Hamner committed

18   and attempted to commit an act to obstruct, impede, and

19   interfere with a law enforcement officer lawfully engaged in

20   the lawful performance of his official duties incident to and

21   during the commission of a civil disorder.  And that's a

22   violation of 18 U.S. Code § 231(a)(3) and 2.  The maximum

23   sentence for that offense could be up to five years of

24   imprisonment.  And the offense level that applies to that

25   particular offense under the guidelines is disputed here.

1      This defendant pled guilty to obstructing, impeding, and

2  interfering with officers, and everyone agrees that you start

3  with § 2A2.4 of the guidelines, which is helpfully entitled

4  "Obstructing or Impeding Officers."  The base offense level

5  under that guideline starts you off at level 10.  But under

6  that there's a specific offense characteristic that permits an

7  increase of three levels under (b)(1)(A) if the offense

8  involved physical contact or (B) a dangerous weapon was

9  possessed or its use was threatened, then it goes up three more

10  levels.  And there are other increases that don't necessarily

11  apply in this situation.

12      I do find -- and I'll set out in more detail in a

13  moment -- that a dangerous weapon was possessed, or at least

14  its use was threatened, and that this would, if that guideline

15  was where we stopped, lead to an offense level of 13.  But,

16  § 2A2.4 has a subsection (c) that's a cross reference that

17  leads you to another guideline.

18      And I just say to the members of the public who are

19  listening to this, you can't blame this on me.

20      Yes, Mr. Smith?

21      MR. SMITH:  Your Honor, I just want to clarify

22  whether the Court would hear argument on this point before the

23  Court makes its finding on the range, or is the Court inclined

24  to just rely on the papers and --

25      THE COURT:  I am, I believe, very thoroughly

1    knowledgeable about your arguments and the guidelines and I

2    don't think I have too many questions.  And --

3              MR. SMITH:  Would Your Honor mind if I just make just

4    a couple of quick points?  Probably less than three minutes.

5    Because just --

6              THE COURT:  Well, let me wait until we get to the

7    point where that would be appropriate.

8              MR. SMITH:  Okay.  Thank you.

9              THE COURT:  I understand that you have a lot to say.

10   These are two of the longer sentencing memoranda I've received.

11   And I've spent a lot of time digging into everything you have

12   to say and there may not be anything you need to add.

13             All right.  So, where I was, was the cross reference in

14   § 2A2.4(c), which says if the conduct constituted aggravated

15   assault -- well, (c) sends you to another guideline.  If the

16   conduct constituted aggravated assault, the guideline is

17   § 2A2.2 instead.  And that's a very significant move because

18   that guideline starts at level 14, four levels higher, and then

19   it, too, has the specific characteristics that permit, this

20   time, an increase of four levels for the use of a dangerous

21   weapon and only three for its threatened use.  And it permits

22   an adjustment if the victim is an official victim that isn't

23   available under § 2A2.2.

24             The presentence report says, "As it appears the instant

25   offense constituted an aggravated assault, this cross reference

1      applies," but it doesn't detail its reasoning.  So what is an

2      aggravated assault under the U.S. Sentencing Guidelines and

3      according to the Commission?  The application notes say that an

4      aggravated assault is a felonious assault that involves one of

5      four things:  (A) a dangerous weapon with intent to cause

6      bodily injury -- not merely to frighten -- with that weapon;

7      (B) serious bodily injury; (C) strangling, suffocating, or

8      attempting to strangle or suffocate, or; (D) an attempt to

9      commit another felony.

10          So the first question is:  Is this an assault?  The

11     parties agree on what the definition of an assault is.  They

12     both point me to 994 F.3d 1096, at 1099, a Ninth Circuit case

13     that applies the common law definition of a willful attempt to

14     inflict injury on the person of another or to threaten to

15     inflict when coupled with the apparent present ability to do so

16     that cases a reasonable apprehension of immediate bodily

17     harm -- which is very close to what the definition would be if

18     we were sitting in Superior Court in an assault case.

19          The conduct here fits the definition of an assault.  And

20     Count 2 is punishable for more than one year, so it is a

21     felonious one.  But is it an aggravated one?  We don't have

22     aspect (B), the serious bodily injury, and we don't have (C),

23     the strangling or suffocation.

24          So do we have (A), the use of a dangerous weapon with

25     intent to cause bodily injury?  How do the guidelines define a

1    dangerous weapon?  Again, you have to look at the application

2    notes for the aggravated assault guideline, and it says,

3    "Dangerous weapon" has the meaning given that term in § 1B1.1,

4    application note 1.  And that includes any instrument that's

5    not ordinarily used as a weapon -- could be a car, it could be

6    a chair, it could be an ice pick -- if that instrument is

7    involved in the offense with the attempt to commit bodily

8    injury.

9         Application note (1)(E) says a "dangerous weapon" means

10   an instrument capable of inflicting death or serious bodily

11   injury, or an object that is not an instrument capable of it,

12   but closely resembles one, or something the defendant used in a

13   manner that created the impression that the object was an

14   instrument that could cause bodily injury, such as when someone

15   pretends to have a gun.

16        I find that the massive sign being pushed into and over

17   the police line was capable of inflicting serious bodily injury

18   and would qualify as a dangerous weapon, even if it's not

19   something ordinarily utilized as a dangerous weapon.  And this

20   is supported by docket 28-1, the FBI 302 containing police

21   eyewitness accounts of the size, weight, and sharp corners of

22   the sign and its supporting metal frame and wheels.

23        But just having a dangerous weapon isn't enough for (A),

24   there has to be evidence of the intent to cause bodily injury.

25   The government says there can be little serious dispute on that

1     issue.  And that seems to be the probation office's basis for

2     applying the cross reference.  But the government bears the

3     burden by a preponderance and I don't see what the evidence of

4     this defendant's state of mind is.  Couldn't one also find that

5     the goal was to push them back, disrupt the line and interfere

6     and obstruct, as opposed to causing bodily injury?

7           I will give you a very brief opportunity, if you want to

8     address this, on behalf of the government.

9                 MR. COLLYER:  Thank you, Your Honor.  I would just --

10                THE COURT:  Yes?

11                MR. COLLYER:  I would just add that I think the --

12    not only is the manner in which the sign used important, but

13    the context in which it was used important.  The sign was

14    pushed into and onto a group from which the defendant was

15    standing against, in the context of what was essentially a

16    medieval battlefield where there was constant hand-to-hand

17    combat for something over an hour.  And not isolated incidents.

18    Constant assault.  This is one of those examples.

19          So when you consider what took place -- which is clearly

20    depicted on the video -- the manner in which the defendant is,

21    with intensity, pushing that sign -- his knees are bent, his

22    back is bent -- he is pushing that sign into the police.  And

23    then take the larger picture into context, which was this was a

24    battlefield.  And putting all those together, that clearly

25    shows, at least by a preponderance of the evidence, that the

1    intent here was to injure the police so that they could get

2    through.

3          Now, I understand, of course, with any mens rea element

4    the government can never affirmatively prove what's in

5    somebody's head with direct evidence.  But here, the

6    circumstantial evidence, from the manner in which the sign was

7    used, the sign itself, and the context in which it was used

8    that day and what was happening at that time, at that very

9    place, shows that the intent in throwing that sign was to

10   injure the police officers so they could get through the line.

11         THE COURT:  All right.  At the time of the detention

12   hearing I said, "This ruling is not based on a finding that the

13   defendant threw the sign; that's not depicted in the video.

14   However, the billboard did not 'move toward the police line' --

15   as the defense had put it -- on its own.  It was plainly being

16   used."  But then I said, "It was plainly being used in an

17   aggressive, offensive manner to disrupt or dislodge the line of

18   officers, and the defendant plainly participated, albeit close

19   to the end of its journey."

20         And while the sign itself largely passed over the heads

21   of the officers, we do have to take into account the fact that

22   it was being held by the huge stand and with huge wheels, which

23   have now been turned vertical and they're not horizontal on the

24   ground.  And the FBI 302 provided by the government includes an

25   account of an officer who turned to face the wheel coming

1   straight at his head.  But even he said, in docket 28-1, he saw

2   rioters actively pushing the sign into and against the police

3   line.  He believed this was done by the rioters in order to

4   breach the police line.

5         So I don't believe the government has proved by a

6   preponderance that this meets the definition of aggravated

7   assault in subsection A, the use of a dangerous weapon with the

8   intent to cause bodily injury by a preponderance of the

9   evidence.  And if it did, then we'd have to deal with the

10  question of if that use of the dangerous weapon is what

11  elevates the base offense level to 14, why it would be fair to

12  then add on the extra four points for the use of the same

13  weapon as a special offense characteristic?  But I don't think

14  I have to address that because I'm not going with that theory

15  of an aggravated assault.

16        But it's also the government's position that Count 2

17  falls into category (D), an assault that involved an intent to

18  commit another felony.  So what's the other felony?  The

19  government says Count 1, 18 U.S. Code § 111(a)(1) and (b).  And

20  it says that the assault committed in Count 2 involved an

21  intent to commit Count 1, another felony.  But the cases the

22  government relies upon all involve something of a different

23  nature, an assault on an officer when you're committing a

24  robbery, when you're trying to get away from a drug offense or

25  some other offense.  And those cases seem inapposite to the

1    specific thing I'm being asked to do here.

2          Count 1 charges using the same large metal sign to

3    assault, resist, oppose, impede, intimidate, or interfere with

4    the same officers engaged in their very same official duties.

5    And the government's asking me to find that the defendant

6    committed the assault on the officers with the sign, in Count

7    2, with the intent to commit the felony offense of assaulting,

8    impeding, and interfering with officers based on the exact same

9    facts in Count 1, and that is another, quote/unquote, felony

10   offense from the charge of impeding and interfering with the

11   officers.

12         But I'm concerned that the case law doesn't go that far,

13   even if some sort of elements/*Blockburger* type analysis would

14   let you find the offenses to be different because they have

15   different elements.  And the only cases in which that finding

16   has been made in this courthouse so far that the parties have

17   identified are cases in which the parties took the issue off

18   the table in the plea agreement.

19         And the extra problem that we have in this case is we're

20   not using the 231 offense as another felony for the 111

21   offense.  We're going the other way.  You're saying the intent

22   to commit the 111 offense was the other felony for purposes of

23   Count 2.  But, for a violation of 111(a)(1) to even be a

24   felony, if you don't have physical contact with the victim,

25   your acts have to involve the intent to commit another felony.

1    So, the other felony for Count 1 has to be Count 2.

2         So, I don't see how the interference with officers

3    during a civil disorder can be the other felony that's the

4    necessary element to charge a felony violation of § 111, while

5    at the same time § 111 is the other felony that makes the

6    interference with the officers an aggravated assault.

7         The government noted that the cross reference was

8    applied in the *Leffingwell* case.  But in that case the

9    defendant pled to a § 111 violation.  He did have physical

10   contact with not one, but two victims.  And most important, he

11   agreed not to dispute the application of the guideline at the

12   time of the plea.  And that was the reason I gave on the record

13   for using the aggravated assault guideline.

14        Similarly, Judge Friedrich, in the *Creek* case, had an

15   agreed-guideline calculation in front of her.  She was less

16   troubled by the double counting issue.  But there the defendant

17   pled guilty to § 111 and the 231 was the other felony, so you

18   only had to make the cross reference in one direction.  Also,

19   her defendant had physically grabbed an officer and forcefully

20   dragged him across the plaza and thrown a strap weighted down

21   with some metal objects in it at him.

22        I will give each party an opportunity to address that

23   very narrow issue.  I frankly don't think it's necessary, but

24   if the government would like to say anything further about the

25   issue, I'll be happy to hear it.

1          MR. COLLYER:  Very briefly, Your Honor.  The

2    government would submit that this case is a palindrome to the

3    *Creek* and *McCaughey* case, which is our convictions of 111 with

4    231 being the other felony.

5          THE COURT:  All right.  But, you understand, 231 --

6    you didn't have to find that 231 was a felony using 111 to then

7    have -- you don't have -- you're only going one way, not two,

8    and that's what differentiates it for me a little.  It's even

9    one more layer of problem here that you don't have there.

10         MR. COLLYER:  But you also don't necessarily have to

11   find another felony for 111 to be a felony.  It can be the

12   felony through the use of the weapon, which we have here.  So

13   both of those things -- or, excuse me, contact, which we have

14   here.  So both of those things elevate 111 separately.

15         THE COURT:  We don't have contact here.  We had

16   contact in *Leffingwell*.  We have the use of a weapon, but I

17   think it had to be the other felony was the thing for 111 that

18   makes it more contact.

19         MR. COLLYER:  Your Honor, the sign makes contact with

20   the police.  Physical contact has been found in the context of

21   an inmate throwing urine into a corrections officer's face.

22   The inmate didn't actually touch the officer, the urine did,

23   and physical contact was found there.  That's a Seventh Circuit

24   case.  So that's a separate manner in which you can get to the

25   111.

1          So I would submit that the question before the Court is:

2     Is the conduct that constituted a violation of 231, does it

3     also constitute a violation of 111?  And the answer is yes.

4     111 is a very inclusive statute.  There are six separate verbs

5     that can separately be violations of that statute.  And so if

6     the conduct that constitutes the 231 would also constitute a

7     111 -- and in this case it would -- then it is with the intent

8     to commit another felony.  And so that's what I would say the

9     issue is here.  And the answer to that question is yes, it

10    would constitute.

11         I understand this is an issue of first impression so far

12    in terms of the direction we're going; 231 conviction going to

13    111.  But the logic holds true.  If one is responsible for an

14    aggravated assault on a violation of 111 with the intent to

15    commit a 231, then one is responsible for an aggravated assault

16    for a violation of 231 with the intent to commit a 111.  And

17    that would be my point, Your Honor.

18              THE COURT:  All right.

19              MR. COLLYER:  Thank you.

20              THE COURT:  Mr. Smith, you can give your three-minute

21    summary.

22              MR. SMITH:  Thank you, Judge.  We, the defense,

23    completely agrees with the Court.  The Court's put it in better

24    ways --

25              THE COURT:  I haven't ruled yet.

```
 1              MR. SMITH:  -- than we have.
 2         Well, we agree with the idea as expressed by the Court.
 3    But, I'd like to add just a couple of points on the "another
 4    felony" issue.  There's two problems, and the Court was sort of
 5    hinting at this.  It's not just that the elements are similar
 6    between the 231 and 111 offense, it's the exact same fact
 7    conduct.  So when the Court was pointing to the cases cited by
 8    the government where the other felony was a robbery in a drug
 9    deal case, or assault in some other -- you know, a bank
10    robbery, it wasn't just that the elements of those two kinds of
11    offenses are different, it's the different fact conduct.
12    Whereas, I think you just heard Mr. Collyer say that it's the
13    exact same fact conduct.
14         So even if there's some distinction, even if we have
15    physical contact here through the urine case and that makes it
16    a felony, there still remains the problem that this is the
17    exact same fact conduct.  And so, as the Court put it, although
18    there might not be a Blockburger issue, that doesn't mean that
19    it's another felony to call the exact same fact conduct a
20    different crime when -- another felony when it's the same
21    conduct at issue.
22         So, it's bootstrapping.  It's like a Mobius strip or
23    something.  This isn't how this is supposed to be used.  And
24    so -- oh, the other point I wanted to make, Your Honor, is that
25    Mr. Collyer pointed out some of the element -- the diversity of
```

1    the elements in the 111(a) offense.  But there's a D.C. Circuit

2    case that holds that all of those elements are modified by

3    forcible, the word "forcible."  So the use of force has to be

4    used for all of the elements in the 111(a) offense, the

5    intentional use of force.

6         I think that's it, Your Honor.

7         THE COURT:  All right.  I think I understand your

8    argument.

9         The guidelines don't define another felony for purposes

10   of the cross reference in 2A2.4, although I'm not sure it would

11   help if they did.  There is a definition of "another felony" in

12   another guideline, § 2K2.1, which covers the possession of a

13   firearm.  That guideline has a special offense characteristic,

14   (b)(6)(B), if the defendant used or possessed any firearm in

15   connection with another felony offense or possessed it with

16   reason to believe it would be used to possess in connection

17   with another felony offense, and there's an increase that goes

18   along with that.

19        And the guideline under § 2K2.1(c)(1) also has a cross

20   reference if the defendant used a firearm in connection with

21   the commission or attempted commission of another offense, and

22   then it says you would use the guideline for that offense.

23   And, so, that guideline has application notes and it defines

24   those terms.  And it says, "Another felony offense for purposes

25   of subsection (b)(6)(B) means any federal, state, or local

1    offense -- other than the explosive or firearms possession or

2    trafficking offense -- punishable by imprisonment for a term

3    exceeding one year."  And "another offense," for purposes of

4    subsection A, means a federal, state, or local crime other than

5    the explosive or firearms possession offense, regardless of

6    whether a criminal charge was brought.

7         In other words, it defines "another" as another, the way

8    people understand it.  It doesn't directly answer the question

9    of whether "another offense" means something, as Mr. Smith

10   said, factually distinct, such as drug trafficking, robbery or

11   assault, or just another offense with slightly different

12   elements arising out of the exact same factual circumstances,

13   the possession of that very weapon.

14        But there's no reason to believe that this is meant to

15   be based on just the hypertechnical alignment of elements.

16   Because when the guideline, at least in the gun context, tells

17   you, well, you'd use the guideline for that offense instead of

18   the firearms offense, it seems clear that it means something

19   other than another gun possession offense.  And it seems that

20   the government's approach strips the provision of any meaning.

21        It strikes me that if the Commission is asking:  Did you

22   commit the assault with the intent to commit some other

23   offense? it didn't mean with the intent to commit that exact

24   same assault, just charged differently.  They could have easily

25   defined "another offense" as any offense with any different

1    elements that's a different offense, but they didn't.

2          It's also important to note that the cross reference

3    says you go to aggravated assault if the assault on the police

4    officer involved the intent to commit another felony, not the

5    same intent needed to satisfy the elements of another felony,

6    not that it was committed during the commission of another

7    felony.  This suggests that the guideline is meant to cover

8    just the situation in the cases that you cited, where the

9    assault on the police officer is intended to facilitate or

10   further or advance or succeed in the commission of or evasion

11   of apprehension for a second, different crime.

12          And the reason this is important, I think as I've

13   already said, is if we use the guidelines specifically

14   designated for an assault on officers, § 2A2.4, starting at the

15   base level of 10, add the three levels for the possession and

16   threatened use of a dangerous weapon -- which is indisputable

17   here -- you get to a level 13.  You adjust for his acceptance

18   of responsibility and you're at a level 11.

19          But, if you utilize § 2A2.2 for aggravated assault, you

20   start at a base level of 14.  You add four levels for the same

21   use of the same dangerous weapon and now you're at level 18.

22   So you're already eight levels higher, but you're not done yet

23   because under § 2A2.2 you get to add six levels for -- under

24   § 3A1.2 for an official victim, if the victim was a government

25   officer and the offense of conviction was motivated by that

1    status.  That adds six levels.

2          But, the application notes explain that that enhancement

3    is not available under § 2A2.2 because that guideline

4    specifically incorporates the notion that it's a police officer

5    involved from the start.  So they incorporate that notion, but

6    you end up at a lower guideline.

7          So, under aggravated assault you're now up to level 24.

8    You get three levels for acceptance of responsibility, level

9    21.  We have a difference of ten levels on the guidelines chart

10   for the exact same set of facts.

11         Then you have the problem that the criminal history

12   category -- which I understand is disputed -- is calculated by

13   the probation office to be Roman numeral V.  The defendant says

14   it's IV because his 2002 conviction involving marijuana in

15   California, described in the presentence report in paragraph

16   41, was expunged under the California Health and Safety Code

17   and shouldn't count.  The probation office, the government

18   disagree.

19         But I don't think I have to rule on that issue because

20   Count 3 in the 2002 conviction was the possession of explosives

21   and that wasn't expunged.  And given the time you'd served when

22   his probation was revoked on that count, as well as on the

23   marijuana count in 2006, the three points was properly

24   assessed, even if you don't include the marijuana at all.

25         So he's at a criminal history category of Roman numeral

1    V.  Under § 2A2.2, the recommended advisory sentencing

2    guideline range at level 11, category V, would be 24 to 30

3    months.

4         Under § 2A2.4, the advisory sentencing guideline range

5    for an aggravated assault at category V would be 70 to 87

6    months, which I note already far exceeds the statutory maximum

7    of 60 months anyway.

8         So you've got two guideline calculations for the exact

9    same set of facts and a violation of a statute for which no

10   guideline is even assigned in the manual that produce a

11   46-month -- or almost four-year -- difference on the low end

12   and a 57-month -- so four and three-quarters -- difference on

13   the high end, and the second one starts higher than the

14   statutory maximum you could ever get, in any event.

15        Therefore, given the fact that the showing necessary for

16   the application of the cross reference under subsection A has

17   not been made, given the government's inability to produce

18   evidence to establish the defendant's intent to cause bodily

19   injury by a preponderance of the evidence, given the

20   circularity involved in the government's proposal, that I find

21   that subsection D applies, and that is that the assault, which

22   is the offense of conviction, involved an intent to commit

23   another felony when the other felony is the exact same assault

24   that likely wouldn't be a felony unless it was committed with

25   the intent to commit another felony.

1   And finally, at best, the cross reference is ambiguous.

2   And under such circumstances the Rule of Lenity requires the

3   adoption of the definition that favors the defendant.

4   I find, for purposes of this case only -- and certainly

5   not every criminal case and not every January 6 case -- that

6   the appropriate guideline calculation in this case is the 24 to

7   30 months under § 2A2.2.

8   The analysis is fact dependent.  However, I think it's

9   important to point out, Mr. Smith, that it's very troubling

10   that if you use only § 2A4.2, the guideline gives so much less

11   weight to the official role of the victims, and the fact that

12   they were law enforcement officers motivated the attack, which

13   was unquestionably an assault with a dangerous weapon against

14   law enforcement officers performing their duties during the

15   time of a civil disorder.

16   And, therefore, I think it's necessary, no matter which

17   way I rule on the guideline issue, to take both guideline

18   ranges into consideration when applying the statutory factors

19   under 3553(a), particularly (a)(7), which talks about the need

20   to avoid unwarranted sentencing disparities with defendants of

21   similar records who have been found guilty of similar conduct,

22   and when determining what sentence would be sufficient, as well

23   as not greater than necessary.

24   So that's my ruling with respect to the guidelines.  So

25   we understand where we are in terms of that.  But, then I'm

1    also thinking about the other.  And at that point now, would

2    the government like an opportunity to speak regarding the

3    appropriate sentence in this case?

4            MR. COLLYER:  Yes.  Thank you, Your Honor.  Your

5    Honor, the events of January 6th, 2021 left a stain on this

6    nation's history.  Each individual participant contributed to

7    the international embarrassment that is the Capitol riot.  I

8    know the Court is aware of what took place generally that day,

9    so I will not belabor it.  The government's sentencing

10   recommendation is based upon actions this defendant took that

11   day.

12           And just to note for the record, the government agrees

13   with probation's PSI calculation, the final PSI, and still

14   asserts that the final offense level should be 21.

15           I would also just move Exhibits 5, 8, and 9 into the

16   record, which were previously provided to the Court and

17   counsel.  The government recommends a sentence of 60 months

18   incarceration which, under the government's assertion, is the

19   guideline sentence by function of 5G1.1(a).

20           The defendant was one of the first to breach the

21   exterior barriers on January 6th.  He was on the west lawn,

22   near the Garfield Monument, south of the Peace Circle, when he

23   observed the breach occur at 12:52 p.m. at the Peace Circle.

24           He then jumped the fence line that was in place and

25   personally began pulling the fence down, inviting the thousands

1    of rioters behind him to storm the Capitol that day.

2         Within 30 minutes we can put him on the front lines on

3    the West Plaza.  It's important to note that in preparation for

4    the violence, in between the time that he jumps that exterior

5    barrier and tears it down and when he appears on the front

6    lines on the West Plaza, he has replaced his baseball cap with

7    a black helmet.

8         Once on the west front he began to pull away the bike

9    rack barriers protecting police.  He is photographed engaged in

10   a tug of war with police over one such barrier.  During the

11   *McCaughey* trial, just, I believe, two weeks ago, a sergeant

12   from Metro PD testified about the import of the bike racks that

13   day.  And he explained that the bike racks provided protection

14   for the officers, but also acted as a force multiplier because

15   they were able to exert defense over a larger horizontal field

16   by nature of the bike racks which were an unbroken chain of

17   protection.

18        However, once those bike racks started to get stripped

19   away by people like the defendant, the officers were forced to

20   stand shoulder to shoulder, which left their lines subject to

21   easy breaches between the persons of the police officers.  And

22   with the constant waves of pressure from the crowd, which

23   vastly outnumbered police, through active assaults and passive

24   resistance, they were able eventually to break the police line

25   in a number of spots.  One such assault to help break the

1   police line was the assault for which the defendant stands

2   convicted before the Court.

3        Now, defense has repeatedly submitted that the sign was

4   just crowd surfing over the crowd.  But that's belied by the

5   body-worn camera footage.  When the defendant first sees the

6   sign coming north across the crowd he exclaims, "Oh, yeah."

7   And then he taps a rioter between him and the police to warn

8   him of the sign's arrival.  The sign wasn't otherwise going to

9   impact that rioter.  The sign was moving north, parallel to the

10  police line.  That other rioter was between the defendant and

11  the police line.  The sign would have kept passing north behind

12  him.

13       But, the defendant says to the guy in front of him,

14  between him and the police, "Hey, here's this sign."  And it's

15  at the point where it reaches the defendant that the sign stops

16  moving north, it stops moving parallel to the police line, and

17  the defendant is part of the cohort that directs it east into

18  and onto the police line.  He did not grab it moments before it

19  was going to pass over anyway.  It was moving parallel to the

20  police until he is part of the cohort holding it.

21       As I said before, the body-worn camera depicts the

22  intensity with which he is pushing.  His knees are bent, his

23  back is bent, he is pushing into it.  The police, at first,

24  desperately trying to push it back before realizing it's not

25  going to work and they just accept the sign being crashed down

1    upon them.

2          I know this Court is aware of the -- and has noted the

3    size and the weight of the sign and the danger it posed to

4    police.  And the Court has referenced the Capitol police

5    officer who was out there without a helmet, protecting the

6    Capitol, who narrowly avoided injury by happening to turn

7    around at just the right instant to be able to avoid one of the

8    casters hitting him.  And I know the Court has viewed the

9    videos of the assault and I know the Court agrees with the

10   notion that the videos speak for themselves.

11         Moving to the defendant's history and characteristics.  This

12   is the defendant's fifth felony conviction and 11th conviction

13   overall.  He has asserted that he is apologetic to the police

14   and that he would have assisted injured police officers.  But

15   his history of violence and disdain for the police simply --

16   throughout his criminal history belie that.

17         He has, multiple times, been convicted of resisting or

18   obstructing police.  He has either fought or fled from police

19   multiple times.  He bragged about doing so to the police when

20   he was arrested for this offense; told them he's a runner and a

21   fighter, but that these police are lucky today.  Any assertion

22   that he's apologetic to the police or would assist them is

23   belied by his history and his actions.

24         But the police aren't the only victims of his crimes.

25   He's been convicted of felony inflicting corporal injury on his

29

1    spouse in 2010.  Convicted of felony force assault with a

2    deadly weapon with great bodily injury in 2005.

3         And the defendant has put forth the negative effects

4    that his incarceration is having on his family.  But there's

5    only one reason Thomas Hamner is where he is today, and that

6    reason is Thomas Hamner.  And it is not from a single bad

7    decision, it's not from a single event.  It is a repeated,

8    30-year history of this type of conduct that includes violence.

9    January 6 was just the latest example.

10        Given his criminal history and his prior prison and

11   criminal justice sentences, I don't think there actually could

12   be specific deterrence in this case, Your Honor.

13        Defense says that the time he spent in jail thus far is

14   sufficient to deter him from doing this again.  But this is at

15   least his third time obstructing law enforcement, it's at least

16   third time assaulting individuals.  How many times over the

17   last 30 years has he stood before a court and said, "I won't do

18   it again"?

19        Now, the defense argues that many of those who entered

20   the Capitol that day received probationary sentences.  And

21   that's true, but none of those individuals assaulted anyone

22   and, which I would note, that the circuit has noted puts them

23   on a different level of defendant.

24        Defense has presented a number of comparator cases for

25   the Court's sentencing consideration, leaning heavily on the

1   *Leffingwell* case.  As the Court is aware, this case is easily

2   distinguishable from *Leffingwell*.  Mr. Leffingwell had no prior

3   criminal history, he was a decorated military member, injured

4   in service to this country.  He was immediately apologetic to

5   police.  This defendant can make no such claims here.

6         The other cases that defense cites either did not

7   involve an assault or, more glaringly, each one of those

8   defendants had no criminal history.

9         As the Court noted, 3553(a) has the Court compare

10  defendants to other defendants with similar records who engaged

11  in similar conduct, not just the offense of conviction.  And so

12  the government submits that better comparative cases are the

13  *Howard Richardson* case, where Richardson hit a police officer

14  three times and then participated in the exact same sign

15  assault that the defendant here participated in.  He pled

16  guilty to § 111(a)(1) and was sentenced to 46 months.  And I

17  would note that he, although had same escalating behavior in

18  recent years, had no prior criminal history.

19        The *Creek* case, which we have discussed and the Court

20  has noted, Creek pushed two officers, hit one of them and

21  kicked the other.  He, again, had no prior criminal history.

22  He was sentenced to 27 months.

23        In *Scott Fairlamb*, Fairlamb pled guilty to 111(a)(1) and

24  also a 1512.  So I would note that it was the 1512, an

25  obstruction charge, that drove the guideline calculation in

1    that case.  But, it's analogous because here we have similar

2    conduct and similarly situated defendants because Scott

3    Fairlamb had a criminal history.  Not as egregious as this

4    defendant's, but he had a criminal history, including multiple

5    prior convictions for assault.  He was sentenced to 41 months

6    in prison.

7         Your Honor, earlier this year CBS news conducted a poll

8    and found that 62 percent of Americans surveyed believed that

9    there would be violence from the losing side of an election in

10   future years.  Only 38 percent of Americans surveyed believed

11   that the losing side would concede peacefully in future

12   presidential elections.  In order to prevent January 6, 2021

13   from becoming a quadrennial event in this country, the Court

14   needs to send a message that what happened that day was

15   unacceptable and that there are consequences.

16        For those reasons, the government respectfully requests

17   the Court sentence the defendant to 60 months incarceration, a

18   period of supervised release, the mandatory $100 special

19   assessment, and $2,000 in restitution.  Thank you.

20             THE COURT:  Thank you.

21        Mr. Smith, would you like to speak on the defendant's

22   behalf?

23             MR. SMITH:  Yes, Your Honor.  Thank you.  I'm going

24   to make a few points and then Mr. Hamner is going to allocute.

25        The first point I want to make is, as the Court knows,

1     the guidelines range is presumptively the fair range.  And so I

2     think our first position would be for all the reasons that it's

3     the correct range that the Court calculated, it should also

4     apply.

5          Now, the Court noted that --

6          THE COURT:  I'm pretty sure that no defense attorney

7     is going to want me quoting back to them in the future the fact

8     that they just said the guidelines were presumptively fair.

9          MR. SMITH:  Well, I think, just as Your Honor said,

10    that the facts are limited to this case in your calculations.

11    I would make the same comment.

12          But, so, one point the Court made was that that strikes

13    the Court as a little bit -- that the Court was going to take

14    into account the aggravated assault guideline even if it

15    doesn't formally apply because it seems a little bit

16    inappropriate in the circumstances of January 6 to apply a 24-

17    to 30-month range.  But I point out that even Mr. Collyer just

18    noted that some of his comparisons, which were sentenced using

19    the aggravated assault guideline, fell within the 24- to

20    30-month range.  Mr. Collyer just cited a case that he compared

21    to Mr. Hamner, and that was a 27-month sentence.  I think -- I

22    can't remember which --

23          THE COURT:  Was that *Creek*?

24          MR. COLLYER:  (Nods head.)

25          THE COURT:  Okay.  Go an.

1          MR. SMITH:  So I think that itself shows that there's

2     nothing wrong with how the Commission decided this type of

3     offense would be sentenced.

4          The other point I want to make is 24 to 30 months, as

5     the Court knows, is nothing to sneeze at.  A day in prison is

6     nothing to sneeze at, especially during the pandemic when, like

7     Mr. Hamner experienced, you're in solitary confinement for

8     hundreds of hours at a time when you're serving pretrial

9     confinement and afterwards.

10         The *Leffingwell* case on disparity -- unwarranted

11    disparities, Mr. Collyer is correct, there is more than a few

12    ways in which Leffingwell's background is different than

13    Mr. Hamner's, and yet the offense conduct is very important,

14    too.  There is no comparison between punching multiple officers

15    in the head and touching the sign and holding the sign and

16    carrying it and directing it, as Mr. Hamner did.  That conduct

17    is criminal, but it is not nearly as aggravated as

18    intentionally punching someone in the head, which can give you

19    a concussion, or worse.

20         Mr. Collyer said that none of the comparisons the

21    defense offered involved assault.  That's not the case.  One

22    comparison we made was to the *David Blair* case, that's

23    21-CR-186, where, after walking up to a cop and saying, "What's

24    up, Motherfucker?  What's up, Bitch?" the defendant assaulted

25    the officer with a lacrosse stick.  The sentence in that case,

1    for this charge, 231(a)(3), was five months.

2         THE COURT:  That's part of the problem you have here, is

3    that, as you know, every sentencing goes into so much more than

4    just the offense conduct.  We don't know what that person's

5    record is, we don't know what they've done since.  And, so,

6    it's helpful to a certain extent, but it isn't helpful.  You

7    know, for instance, I know a lot more about the differences

8    between *Leffingwell* and this case than either one of the two of

9    you have acknowledged.  But -- so that one I have a handle on,

10   whether it's analogous or not.  And the others are helpful, but

11   I really want to know what the appropriate sentence is for this

12   offense, for this defendant.  I think that's the best place to

13   focus your remarks.

14        I understand that disparities are a factor, but we

15   really have to figure out what to do here.  And at the end of

16   the day, too many of the analogies start to be unhelpful

17   because you can find anything -- it's like legislative history,

18   you can find anything you want.

19        MR. SMITH:  Well, let's put it this way, Judge:  So

20   in the case of *David Blair*, who assaults an officer with a

21   lacrosse stick, he may have had no criminal history, but the

22   criminal history -- which would seem to be the only difference

23   with Mr. Hamner's case here -- is from ten years, it's a decade

24   ago.  I understand that it's still formally scored because of

25   these quirks in how probation violations are scored, but if

1    that weren't the case, the criminal history would be three or

2    two.

3          If the Court goes through all of the points that are

4    jacking the range up, it's all the situation where the crime --

5    the penalty for the crime itself falls outside of the range in

6    which it's scored, but then it creeps into the range because

7    there's a probation violation that extends it in.

8          So, if it weren't for that type of scenario -- I guess

9    the Court can consider the argument I'm making as a departure

10   type or variance argument, that the seriousness of the criminal

11   history is overstated, given that it would ordinarily be

12   outside of the count of the range.

13         And, so, we would say, our position on the criminal

14   history, Judge, is he's changed.  He left California when he

15   was in with a bad crowd.  He moved to Colorado.  He's married,

16   he has a family with lots of minor children, and he hasn't

17   committed crimes for ten years.  So we say that this is -- the

18   criminal history score here is seriously overrated.  And even

19   if it's not, it doesn't mean that someone who assaults a cop

20   with a lacrosse stick would have a five-month sentence and

21   Mr. Hamner's would be above a 30-month -- the 30-month range

22   that the Court has calculated.

23         Then there's Mr. Hamner's children.  The Court, I think,

24   has already noted that this situation is already a crisis for

25   his family.  One of his minor daughters is experiencing mental

1    health issues and having to see a therapist because of

2    separation from her father.  The business has been crushed,

3    that Mr. Hamner was managing with his wife.  I heard more about

4    it this morning from his best friend, who is also here.  It's a

5    crisis in their family.  And the Court might point out that the

6    guidelines say this shouldn't be considered normally.  Well,

7    the Court is entitled to disagree with that as a policy matter,

8    and also consider that for variance purposes.  And it's

9    serious.  I don't understand why the Commission thinks that

10   that's something that shouldn't be considered, because they --

11   I guess the reasoning is that it's true in every case; well,

12   it's not.

13          I don't have children.  Mr. Hamner has many children.

14   There's a big difference there.  It doesn't mean that someone

15   with children is entitled to commit crimes or that's an excuse,

16   but that's collateral damage, is something the Court should

17   consider.  And it's important, for deterrence, when I hear the

18   prosecutor say sitting in hundreds of hours of solitary

19   confinement is not deterrence, it makes me want to ask the

20   prosecutor whether he's ever been to a federal prison, whether

21   he's represented someone who has gone to jail.

22          It is a soul-crushing experience to be in a cell for 23

23   hours a day.  There's social science literature backing this

24   up.  It's as easy as using Google.  It's crushing.  That's not

25   an argument to pity Mr. Hamner, but it's certainly incentive

1    not to go back to where he is.

2          Judge, I think on remorse, I'm going to let Mr. Hamner

3    speak for himself.

4          Are there any questions the Court has?

5          THE COURT:  No.  This is isn't usually where I ask

6    questions.  I want to hear what people want me to hear, that's

7    really the purpose of the sentencing.  So I don't have

8    questions for you.  And I am happy to hear anything that

9    Mr. Hamner wants to say to me.  And if you have more to say,

10   I'm going to listen.  But it's time for him to speak, he can

11   come to --

12          MR. SMITH:  Okay.  I'll let him take it away.

13   Thanks.

14          THE COURT:  -- the lectern and join --

15          THE DEFENDANT:  May I remove my mask?

16          THE COURT:  Yes.

17          THE DEFENDANT:  Thank you.  I would like to start by

18   apologizing to everybody involved, especially to those

19   individuals that may have been negatively impacted as a result

20   of my actions or behavior.  I am deeply sorry.  The events that

21   took place that day are by far one of the biggest regrets of my

22   lifetime.

23          My initial intent of attending the rally in support of

24   the President quickly became distorted when I made the decision

25   to not leave the rally directly after the speech.  I have

1    replayed those moments over and over in my head, wishing that I

2    had made a different choice.  No matter how I tell the story, I

3    have to accept the facts of my actions.  Will the people I hurt

4    ever be able to forgive me?  How selfish I have been?  If I had

5    to do it over again, I would have chosen to put my family first

6    and my freedom.

7         You see, in order to understand the background of how I

8    ended up where I did, I first need to go back to the beginning.

9         Eleven years ago I made a choice, a choice that would

10   end up changing the course of the troublesome road I had been

11   traveling down.  Although this choice meant that I would fail

12   to complete the classes that I had been sentenced to, required

13   by probation, and ultimately led to a warrant for my arrest.

14   It also freed me from the bondage of my past dictations, and it

15   did get me far away from the negative influence that I just

16   could not seem to escape.

17        Looking back on that decision, I realize that there were

18   probably different choices that I could have made that would

19   have resulted in me completing my probation successfully, but

20   at that time, I honestly felt that leaving California was my

21   only option if I was going to survive.  Coming to Colorado was,

22   in fact, the single best decision I have ever made and led me

23   to become the God-fearing man I am today.

24        The biggest blessing of all from that one decision was

25   finding the love of my life, my wife Stephanie.  After eight

years together we are stronger than ever.  Having a blended

family with seven children has been an unforgettable journey.

And somehow we were still able to build not one, but two very

successful businesses.  One is a title company specializing in

residential, commercial construction.  The other is a franchise

focused on kitchen and bathroom design and remodeling.

My two adult daughters are all grown up and out of the

house now, as is Stephanie's oldest son.  At home we have my

nine-year-old son Blythe; Dillon who is 17; our beautiful

13-year-old daughter, Liliana, and our youngest little guy Ben,

who has just turned five.  I believe that parenthood requires a

whole lot of love, not a whole lot of DNA, which is why they

only know me as their dad.  The love for my stepchildren is the

greatest love I have ever known.

It was important for me to share those details with you

in order for you all to understand the events that occurred

right before my arrest.  On November 5th, 2021 is a day where

mine and my family's world fell apart.  We received a call from

the middle school that our daughter Liliana had been taken by

the school resource officer to the hospital and put on an M1

hold.  This came as a shock to us since we had already put a

504 and an IEP plan in place with her school which required all

school staff and counselors to immediately phone home, should

Liliana come to the office for any reason or if Lili started to

express any unfavorable attitude or negative self talk.

1    Our daughter begged and pleaded with the officers and

2    staff to call mom and dad.  She knew it wasn't right that she

3    was being taken off of school grounds without first speaking

4    with the parents.  Instead, we learned that not a single person

5    decided they should call us before forcing our daughter to be

6    taken to the hospital against her will.

7    For the next several hours our daughter was missing and

8    could not be located.  The school was telling us she was at

9    Memorial Hospital, the hospital was telling us they did not

10   have anyone there by that name.  The police were telling us

11   they had taken her to the hospital, so she should be there.  It

12   took many hours for them to locate our daughter, and my wife

13   was finally brought back to her room, where she was located.

14   The nightmare continued after the hospital told my wife

15   she could not stay with our daughter and had to leave the

16   hospital.  Lili was terrified and all alone.  The hospital

17   forcefully kept her for the next three days, eventually

18   releasing her on Monday, November 8th.  We were all so thrilled

19   that Lili's back at home, safe with her family once again.

20   Little did I know that once again we would be torn apart from

21   each other just one day later.

22   I was leaving a business meeting with the Salvation

23   Army, one of my clients, when I was met with the 12 to 16

24   officers and agents, with weapons drawn.  They yelled at me to

25   put my hands in the air.  They told me I had a warrant having

1    to do with the January 6th, 2021 event, and that I was under

2    arrest.  To this day I cannot understand why I made the

3    statement about being a runner and a fighter, other than that

4    was me trying to explain who I had used to be, but that I am

5    not that type of person any longer.

6         I most definitely was holding some resentment after the

7    weekend we went through as a family and had some

8    less-than-positive feelings over the handling of my baby girl,

9    although that is certainly no excuse.  I owe an apology to

10   those officers and those agents, the Court, to my family, to my

11   nation.  And this is not the kind of example I wish to set for

12   my children or anybody, and I could have done better.

13        These circumstances were about to have a lasting

14   impact -- negative impact on my daughter, who not only just

15   suffered the most traumatic weekend of her young life, but now

16   the person she had looked at as a father figure for eight years

17   was not going to be coming home anytime soon.  She's being

18   re-traumatized, after already suffering from severe abandonment

19   issues from her absent biological father.  Her mental state has

20   now become even more fragile than ever, with several more

21   suicide attempts and hospitalizations to follow while I have

22   been incarcerated.

23        My wife also discovered and informed me that our

24   17-your-old son had been secretly dealing with severe

25   depression for years and used cutting as a means for escape.

1    He apparently decided that we had our hands full with our

2    daughter, that he did not want us to know that he was suffering

3    as well.

4          Only now my wife has been left to deal with all of the

5    day-to-day challenges on her own, trying to raise our young

6    now-five-year-old son who just started kindergarten, while also

7    supporting our older children who struggle with severe

8    depressions, anxiety, OCD, ADHD, and bipolar disorders, as well

9    as having to operate both businesses.  No one should be

10   expected to take on such tasks all alone.  But she is truly,

11   truly my champion, and I will never be able to repay her for

12   this gift.

13         I pray for their forgiveness, love, and support.  It

14   pains me to know how much hurt I have caused them.  I have a

15   lot of work to do in order to right the wrongs for the mental

16   anguish I inflicted.  I have a spiritual commitment.  For the

17   community I can give time and service for the crimes I

18   committed.  I can serve the sentence imposed.  I do not ask for

19   mercy, what I ask for is opportunity.  May I be given an

20   opportunity to do better as a citizen in this society, to be

21   the best father and husband I can be, and prove that I am no

22   longer the person I used to be.

23         Thank you for allowing me to address the Court, Your

24   Honor.

25               THE COURT:  Thank you for speaking.

1        What I want to do now is just take a few minutes to

2   organize my thoughts in light of everything I've just heard,

3   and ask you all to stay close to the courtroom.  It's only

4   going to be about 10 or 15 minutes.  But I'm going to take a

5   break now and return.  You all can remain seated.  Thank you.

6        (Recess.)

7        THE COURTROOM DEPUTY:  Your Honor, recalling criminal

8   case 21-689, *United States of America versus Thomas Patrick*

9   *Hamner*.  Mr. Hamner is present in the courtroom.  Probation

10  officer is Officer Walters.  Counsel for Mr. Hamner is

11  Mr. Smith.  Counsel for the government is Mr. Collyer.

12       THE COURT:  Mr. Smith and Mr. Hamner, if you would

13  come back to the lectern, please.  It's very difficult to talk

14  to somebody who is over there.  You're the one who needs to

15  hear what I have to say.

16       As I said, I'm going to go through every single factor

17  in the sentencing statute, and that takes time, but it's

18  because they're all equally important.

19       The first thing I have to consider is the nature and

20  circumstances of the offense.  You swore at the plea hearing

21  that you were in fact guilty of taking steps to obstruct,

22  impede, or interfere with law enforcement officers who were

23  engaged in the lawful performance of their official duties

24  during a civil disorder.  While we may have struggled to

25  identify which of the artificial categories created by the U.S.

1    Sentencing Commission is best suited to the facts, the facts

2    are clear; you can watch it all unfold on videotape.

3         On January 6th a mob descended on the United States

4    Capitol, which was closed to the public as the Vice President

5    of the United States and members of Congress were performing

6    their constitutionally assigned duty of certifying the results

7    of a democratic election.  The building was closed to the

8    public and it was being protected by members of the U.S.

9    Capitol Police and the D.C. Metropolitan Police Department as

10   some members of the angry mob were trying to force their way

11   inside.

12        Apparently this defendant seems to have assigned himself

13   a position as a member of what you could describe as the

14   January 6 offensive line.  He suited up in his helmet and he

15   took multiple enthusiastic and entirely unlawful steps, in

16   three multiple locations, to add his physical effort, his

17   physical strength to the effort to breach the barricade and to

18   disrupt or dislodge the line of police so that the rioters

19   behind him could gain entry to the building.

20        Ultimately, as we know, the mob was successful in

21   overpowering and overwhelming the officers.  Many people were

22   injured, several died, the building was damaged and defiled,

23   and the counting of the Electoral votes was indeed stopped as

24   the participants had to be hurried off to protect their lives

25   and all of the people who had entered the building without the

1    use of any of the usual security precautions had to be rounded

2    up and shown the door.  And, miraculously, they were able to

3    reassume the count after that was done.

4         I'm not exactly sure what the purpose of the history

5    lesson and the argument about how seldom the civil disorder

6    statute has been used in the sentencing memo was supposed to

7    be.  The defense made a strategic choice to plead guilty to

8    that count without benefit of an agreement.  Maybe that charge

9    hasn't been used a lot before, but maybe that's because we

10   haven't had to face this sort of all-out assault on a

11   government building -- and not just any government building,

12   but the center of our democracy, the U.S. Capitol -- very

13   often.

14        The attack on the seat of government, the attack on the

15   democratic process and the peaceful transfer of power that

16   until that day had been one of the fundamental things that made

17   America America was unprecedented.  It was intolerable.  And it

18   caused incalculable harm.  You might have to dust off an old

19   provision of the criminal code when faced with something you

20   should never have had to address in the first place.

21        And there is a lot more to it than what the defense

22   describes as lending his weight to the corner of a heavy sign.

23   Although I do appreciate the fact that in the sentencing memo

24   the defense has, at last, finally conceded that the defendant

25   personally did something and that he indeed interfered with law

1    enforcement and that it was at least reckless.  But the memo

2    continues to gloss over things, with the use of the passive

3    voice, or words suggesting that the sign had some

4    intentionality of its own.

5        I want to be clear:  The sign did not, as the memo put

6    it, lumber towards the officers.  It was lifted, it was

7    carried, it was pushed, and it was heavy and it was huge.  The

8    video exhibits capture, along with the photographs,

9    Mr. Hamner's posture and his effort.  He's putting his back and

10   his legs into it.  And it is entirely too cute and somewhat

11   inconsistent with the plea of obstructing and impeding and

12   interfering with the officers to minimize it as recklessly

13   crowd surfing a dangerously heavy sign.  I do not think so,

14   Mr. Smith.

15       This was not the gleeful passing of an inebriated fan

16   boy over the heads of an adoring crowd at a concert.  This was

17   a weapon, a battering ram, a use of force.  And suggesting once

18   again that the billboard was being forced over, as opposed to

19   into the line of police, ignores the fact that the sign had a

20   huge base, and for the flat part to pass over the officers --

21   which it did just barely -- the base and wheels had to be

22   headed right at them.

23       And you can see on the video that the defendant does

24   take the time and make the effort to get the attention of

25   another protestor in its path -- berating and taunting the

1    officers with a bullhorn -- to let that guy know it's coming.

2    Plus, you can plainly see that the only reason it went over

3    anyone's head is that there is a line of approximately a dozen

4    officers on the other side grabbing it with both of their arms

5    and pressing it upward to defend themselves.

6         And the participation and the effort to propel the sign

7    towards the line of officers wasn't all the defendant

8    accomplished that day.  According to the sentencing memo, he's

9    seen at the Capitol at 2:52 p.m.  I think, according to

10   chronologies generated during the various congressional

11   investigations and hearings and published on multiple news

12   outlets, the President wasn't even speaking by that point,

13   hadn't even talked about marching down Pennsylvania Avenue yet.

14   I'm not certain about that.

15        But early on the defendant is already there and ready

16   for action, and he is there as the first rioters break through

17   police line at the Peace Circle.  He then hops over the

18   barricades himself and begins tearing down fencing, even as

19   other protestors are urging him not to.  This makes it easier

20   for the gathering crowd behind him to maneuver and to get

21   closer to the building.

22        The defendant ends up at the front of the loud and

23   growing crowd at the West Plaza, then wearing the helmet he

24   decided to bring with him to the Capitol.  He joins others

25   trying to wrestle the bike racks being used as barricades out

1     of the hands of D.C. police officers.  Again interfering with

2     law enforcement officers struggling to do their duties.  Those

3     bike racks weren't much, but it's about all they had on January

4     6 and they served the purpose the prosecutor just described.

5     But then, as we know, at about 1:40 p.m., when other members of

6     the crowd started to move the sign that they had discovered

7     towards the officers standing between them and the building,

8     the defendant adds his strength to that effort.  And shortly

9     thereafter, at 2 p.m., the Capitol is breached.

10          People talking about January 6th often talk about a mob,

11    but you can't use language that divests the individuals who

12    comprise the mob of their individual responsibility.  This

13    defendant's presence added bulk and power to the mob.  And he

14    didn't just simply add his presence, as many of those convicted

15    of the misdemeanors did, he added his physical strength and he

16    added action.  He took affirmative steps to make sure the

17    rioters could get past the barricades and past the officers

18    that were standing in their way.

19          And by helping to remove the obstacles in the mob's way,

20    he helped it achieve its goal and, let's be frank, his goal to

21    stop the certification of the election.  That's what Stop the

22    Steal meant.

23          Defendant's family, defendant's wife in particular, and

24    the defendant implore me to take a note of the impact of any

25    potential sentence on the family.  And my heart goes out to

1   both of you.  I can truly, deeply empathize with the struggles

2   with sons and daughters going through emotional issues.  And I

3   agree with you, Mr. Hamner, they're not your stepchildren,

4   they're your children, and your love for them is demonstrated

5   and it's beautiful and it's real.  And it's also true that no

6   parent is ever happier than their unhappiest child, which is an

7   adage that is 100 percent true.

8         But unfortunately, it is this conduct that I just

9   described and the decision to leave Colorado with all of

10  that -- some of that happening even before January 6th -- and

11  not today's sentence that brought about your separation from

12  your children as they continue to struggle with these things.

13        But, as that leads into, I'm also supposed to think

14  about the history and characteristics of the defendant.  This

15  offense is not your entire life story and it's not all there is

16  to you.  You showed me today how articulate and intelligent you

17  are, and your love for and understanding of your family and

18  your children's issues.  Not all fathers get it, I can assure

19  you, and not all of them are as deeply involved.

20        You're also a small business owner and trusted with

21  remodeling of people's homes.  You provide employment for other

22  people, who you treat well, and you've been described as

23  trustworthy, fair, and ethical, performing your work with

24  proficiency, skill, and great attention to detail.  You are a

25  loving father in your blended family and you are involved and

1    helpful in your community.

2          Your history does also, though, include significant

3    prior involvement with the criminal justice system, some of

4    which was violent.  There are five prior felony convictions.

5    Several involve violent assaults on women.  And there were

6    ongoing problems with compliance with your conditions of

7    supervision.

8          And the record reflects a current theme of disrespect

9    for law enforcement, fleeing from arrest, resisting arrest, and

10   disrespect for courts in general when you bragged about that in

11   this case.

12         I agree that the overall calculation of the criminal

13   history score under the guidelines tends to overstate his

14   record, and I agree that all of it happened some time ago.

15   But, as Mr. Hamner was taken into custody in Colorado Springs

16   on November 9th, 2021, it was he who yelled out to a woman that

17   the arrest was for the January 6th event, "I was there."  And

18   then he tells the officers, "You're lucky I ain't running and

19   making you go through hell right now.  Just look at my rap

20   sheet.  I'm a runner and I'm a fighter, but ain't that today

21   because I know that I've been doing right."

22         So, maybe he hasn't changed as much as he would like me

23   to believe from the guy who committed those offenses because

24   he's still bragging about them when he gets arrested for this

25   offense.  And he says he's remorseful for what he did on

1    January 6 now, but even ten months after the attack on the

2    Capitol, after the full scope of the damage was known and there

3    was plenty of time for a cooler head to prevail, the defendant

4    was not the least bit sorry or chastened.  It wasn't really

5    until he was hurt by it and his family had to suffer the idea

6    of being sorry really came to the fore.  And I didn't really

7    hear as much about -- I heard about if he could make the choice

8    again, he would choose his family and his freedom.  And that's

9    all important, but there was not as robust an apology to the

10   officers, which is what this is all about.

11         I'm required, according to the statute, to impose a

12   sentence that's sufficient but not greater than necessary to

13   accomplish the purposes that are set out in the statute.  And

14   there's a lot of them and they often point in different

15   directions.  But I'll tell you what the law says, it says I

16   must consider the need for the sentence imposed to reflect the

17   seriousness of the offense, promote respect for the law,

18   provide just punishment for the offense.  I'm supposed to

19   afford adequate deterrence to criminal conduct -- and that

20   means yours, but other people's, too.  I'm supposed to protect

21   the public from further crimes committed by you, if that's

22   necessary, and to provide you with whatever training or medical

23   care is needed in the most effective way.

24         Looking at all those factors, I do agree that this

25   defendant has already suffered some real punishment.  His

1   incarceration to date has placed him far away from his children

2   at a time in their lives when they need him greatly.  Maybe

3   that separation didn't cause their struggles, but it certainly

4   hasn't helped them and it may have exacerbated them.  His

5   business is struggling he did not have the opportunity to be

6   with his father at the end of his life.  He has suffered and

7   his family has suffered.

8          I don't think the government's recommendation of the

9   statutory maximum gives sufficient credit for that, or for the

10  fact that he has accepted his responsibility and pled guilty.

11  You don't usually get the statutory maximum when you plead

12  guilty.  But I also have to think about a sentence that will

13  recognize the seriousness of this conduct and deter not only

14  you, but other people from thinking that they just get to take

15  matters in their own hands again.  It's not as if the divisions

16  in our country have eased in any way.

17         So I'm not satisfied that a time-served option would

18  serve those statutory purposes.  The heated rhetoric that

19  brought the defendant to the District of Columbia has not

20  subsided.  The lie that the election was stolen and

21  illegitimate is still being propagated.  Right now, government

22  officers involved in the investigation and prosecution of

23  alleged crimes related to January 6 and related to the former

24  President are under attack and subject to threats in

25  unprecedented numbers.  And it's not only certain media

1    figures, but very prominent political figures are eagerly and

2    cagily predicting, or even outright calling for violence in the

3    streets if one of the multiple ongoing investigations doesn't

4    go his way.

5         So it needs to be crystal clear that it is not standing

6    up for America to stand up for one man instead of the

7    Constitution.  And it is not ever justified to attack law

8    enforcement officers who were just performing their sworn duty

9    to protect the U.S. Capitol from attack and attempting to hold

10   back this effort to undo a democratic election in this country

11   that you say you are patriotic about.

12        What happened on January 6 and the effort to keep that

13   spirit alive a year and a half later is the antithesis of what

14   America stands for.  It is the definition of tyranny and it is

15   authoritarianism.

16        I do agree entirely that we have to make sure that

17   January 6 protestors that broke the law aren't treated more

18   harshly than others who break the law.  But I also can't set up

19   some separate category and say, oh, it's okay on January 6 for

20   somebody to attack a line of police officers when they're

21   trying to protect a federal building and control a crowd, when

22   we all know perfectly well that it wouldn't be acceptable in

23   the middle of some other protest.

24        The sentencing statute also requires the Court to

25   consider the need to avoid unwarranted sentencing disparities

1    among defendants with similar records who have been found

2    guilty of similar conduct.  That means your sentence has to be

3    fair when you compare it to other people's.  You can't paint

4    everybody who participated in January 6 with the same brush.

5    Same came to protest what they had been told falsely was a

6    stolen election, but they didn't go inside and they're not

7    charged with anything.  Some entered but didn't hurt anybody or

8    break anything or interfere with law enforcement.  That's not

9    this case.

10        And defendant fits in the more serious category of

11   people who did interfere with besieged officers struggling to

12   do their job while under attack.  But it's also true that

13   within that group there are individuals who engaged in much

14   more egregious conduct, assaulting officers directly with

15   weapons or chemical sprays, and in some cases causing serious

16   injuries.  The defendant should not be subject to the sentences

17   warranted in those cases.  And I'm not sure the government

18   proposal makes all those fine distinctions.

19        The defense points me to the sentence in *Leffingwell*,

20   says it would be a gross unwarranted disparity if he were

21   sentenced -- if this defendant were sentenced to more than the

22   16 months in that case.  But that case does not fit the

23   description of a defendant with similar record who has been

24   found guilty of similar conduct.

25        You seem to have taken time to read the transcript and

1    you couldn't have missed the distinctions, but then you quoted

2    my own transcript back to me -- as if I don't know it very

3    well -- very selectively and pretended that the distinctions

4    weren't there.  The gentleman had no prior criminal record

5    whatsoever.  There was no weapon involved.  He had

6    extraordinary personal circumstances; brain damage due to

7    exposure to IEDs in his years of service in the military.

8         He got inside without assaulting or hurting anyone and

9    stood there largely inactive after that.  And when officers

10   started pushing the crowd back, when he was in front, he

11   punched.  He punched people wearing full riot gear and vests

12   and helmets.  And he apologized that very day to them when he

13   was being processed and didn't even recognize when they had all

14   the equipment off that that's who it was.

15        So the analogy was inappropriate.

16        But, finally, it's important to note that while the

17   guidelines are supposed to serve the function of ensuring

18   parity among similarly situated people, there's circumstances

19   they don't cover.  And I completely agree with the defense that

20   it is important to take into consideration the fact of the

21   conditions that this defendant has had to endure during the

22   approximately 11 months that he's spent awaiting trial or today

23   and that they've been particularly harsh.  It's true you were

24   locked up through nobody's fault but your own, but the jail

25   experience has been overshadowed by the specter of the virus

1    and the need for more isolation, less contact with counsel,

2    less contact with family, less opportunity to move within the

3    facility, constant worry.  And it's similar to the situation

4    that permits a court to find a basis for a departure, even

5    under the *Smith* case when you're talking about immigrants.

6         So in my view, given all of that, just plain credit for

7    time served doesn't necessarily account for the time

8    sufficiently.  So in my discretion, when I'm looking at all of

9    the sentencing factors, including the need for the sentence to

10   be sufficient, but not greater than necessary, to provide just

11   punishment and the need to avoid unwarranted sentencing

12   disparities, the sentence I impose will reflect that.  In other

13   words, while I might agree that a sentence greater than the one

14   I will impose could be appropriate, it would be greater than

15   necessary in this case.

16        In an exercise of discretion and after consideration of

17   all of the sentencing factors, the sentence to be imposed is as

18   follows:

19        It is the judgment of the Court that you, Thomas Hamner,

20   are hereby sentenced to a period of 30 months incarceration on

21   Count 2, with credit for the time you've already served.

22        I recommend that you be designated to a facility as

23   close to your family as absolutely possible.

24        Do you have a request, Mr. Smith?

25             MR. SMITH:  Yes, Your Honor.  The facility that

1    you're referring to is FCI Englewood, which is a one-and-a-half

2    hour drive from the home.

3              THE COURT:  All right.  It was my very strong

4    recommendation that he be designated to that particular

5    facility.

6              MR. SMITH:  Thank you, Judge.

7              THE COURT:  This is based on a consideration of all

8    the statutory factors, as well as the recommended sentencing

9    guideline range under both §§ 2A2.4 and 2A2.2, and it would be

10   my sentence no matter which calculation I ultimately determined

11   should apply.

12             You're further sentenced to serve a 36-month time of

13   supervised release.  I find that you don't have the ability to

14   pay a fine and, therefore, waive the imposition of a fine.  You

15   are required, though, to pay a $100 special assessment because

16   this is a felony.  It's immediately payable to the Clerk of the

17   Court for the U.S. District Court of the District of Columbia.

18   If you change your address after you've been released, after

19   any change of the address you have to notify the Clerk of the

20   Court until such time as the obligation is paid in full.  While

21   you're incarcerated you can make payments on the assessment

22   through your participation in the Bureau of Prisons Inmate

23   Financial Responsibility Program.

24             As for restitution, the government has pointed over and

25   over again, in all these cases, to the over $1.5 million worth

1    of damage due to the building in connection with the pleas in

2    this case, and that's probably a vast understatement.  And in

3    each case people charged or pled guilty to misdemeanors have

4    been paying $500 worth of restitution and people charged with

5    felonies, such as Mr. Leffingwell, whose sentence you've asked

6    me to look at, were ordered to pay $2,000 in restitution.  The

7    defendant will be ordered to pay $2,000 worth of restitution in

8    this case.

9         Within 72 hours of your release from custody you must

10   report in person to the probation office in the district in

11   which you are released.  I will transfer supervision to the

12   district in which you reside, but I will not transfer

13   jurisdiction of this case to any other court.

14        While on supervision you may not possess a firearm or

15   other dangerous weapon.  You may not use or possess an illegal

16   controlled substance.  And you may not commit another federal,

17   state, or local crime.  You must abide, also, by the general

18   mandatory conditions of supervision adopted by the U.S.

19   probation office, as well as the standard conditions that are

20   set forth in the judgment and commitment order, as well as the

21   following special conditions:

22        It is a federal statute that requires you to submit to

23   the collection and use of DNA identification information while

24   incarcerated or at the direction of the U.S. probation office.

25        I will sentence you to perform, over the period of your

1   supervised release, 200 hours of community service at a

2   location and at a schedule to be approved by the probation

3   office.

4        Given the significant record that includes violent

5   offenses and offenses committed while intoxicated and the

6   commission of this offense, notwithstanding the years that have

7   gone by since those, it's going to be a condition of your

8   release that you participate in a substance abuse and mental

9   health assessment to determine whether any sort of substance

10  abuse, anger management, or other therapeutic intervention is

11  warranted.  And, if so, and if indicated by the assessment, at

12  the direction of the probation office you must participate in

13  any outpatient therapy indicated at their direction and under

14  their supervision.  You must abide by the rules and regulations

15  of any program and execute any releases necessary to enable the

16  probation officer to monitor your compliance with the

17  condition.

18       Given the nature and circumstances of the offense and

19  the information related to your criminal history and your poor

20  record of compliance with supervision in the past and your

21  bragging consistent with that record at the time of your

22  arrest, I find, pursuant to *United States versus Malenya*, 736

23  F.3d 554 that this condition is reasonably related to the

24  factors set forth in 18 U.S. Code § 3553, including the need to

25  defer future criminal conduct, to protect the community, and to

1     provide the defendant with any needed treatment in the most

2     effective way possible, and that it involves no greater

3     depravation of liberty than is reasonably necessary for the

4     purposes identified in this section.

5            On release it is also a condition that you make payments

6     on any outstanding balance on the restitution obligation at a

7     rate to be determined by the probation office, but no less than

8     $100 a month.

9            Within 60 days after the commencement of your

10    supervision, I'm going to ask the U.S. probation office

11    supervising you to submit a progress report to the Court.  Upon

12    receipt of the report I'll determine if we should schedule some

13    sort of video reentry hearing to talk about your either success

14    on the program, in which case I want to be able to talk to you

15    about that, and if there are problems, I want to be able to

16    talk to you about that.

17           Mr. Smith, do you have any objections to the special

18    conditions set forth today and the special conditions that are

19    the standard conditions applied by our probation office?

20           MR. SMITH:  No, Your Honor.  Thank you.

21           THE COURT:  All right.  Probation office has to

22    release the presentence investigative report to all appropriate

23    agencies in order to execute the sentence of the Court.

24    Treatment agencies shall return the presentence report to the

25    probation office upon defendant's completion or termination

1    from treatment.

2         Mr. Hamner, you have the right to appeal the sentence

3    imposed by the Court if the period of -- well, actually, those

4    are just usually restrictions imposed in the situation of a

5    plea agreement.  There is no plea agreement.

6         You have the right to appeal the sentence imposed by the

7    Court.  If you choose to appeal, you must file any appeal

8    within 14 days after the Court enters judgment.  If you're

9    unable to afford the cost of appeal, you may request permission

10   from the Court to file an appeal without cost to you.

11        At this point we're not in a situation where there was a

12   plea agreement and other charges are being dismissed; they're

13   pending.  And I don't think either side has had an opportunity

14   yet to think about everything we heard today and how that's

15   going to bear on what's going to happen next.  So what I would

16   like to get is some sort of a joint status report from the

17   parties, setting forth either your joint or your different

18   positions on further proceedings in the case and when and how

19   those should be undertaken.

20        And so how much time do you think, Mr. Collyer --

21   because imagine you're going to have to confer with others in

22   the U.S. Attorney's Office -- to provide something like that?

23        MR. COLLYER:  Your Honor, I would ask -- my plan had

24   been to ask for a status conference in 30 days, to allow

25   effective computation on that.  So to the extent of just filing

1    a joint status report, rather than a status conference, I would

2    still ask for the same 30 days.

3                THE COURT:  All right.  Mr. Smith, does that work for

4    you?

5                MR. SMITH:  Well, I can't speak to the government's

6    ability to confer on the issue before then.  We would probably

7    ask for something a little bit sooner than 30 days, maybe 15,

8    two weeks, or --

9                THE COURT:  Well --

10               MR. SMITH:  But, you know --

11               THE COURT:  Let me look at my calendar.

12          The defendant has, still, speedy trial rights with

13   respect to those charges.

14               MR. SMITH:  We waive any objection to tolling under

15   the Speedy Trial Act.

16               THE COURT:  Today is the 23rd.  I'm going to ask for

17   the status report on Friday, October 14.  That's about three

18   weeks.  I'm kind of splitting the difference here.  If you are

19   agreed as to what your position is and you want to file it

20   sooner, you can file it sooner.  But until I've seen it, I

21   don't know what the next thing I'm setting is, whether I'm

22   setting a motion schedule, whether I'm setting a trial

23   schedule, whether I'm doing nothing.  So I would like to get

24   the report and then see what to do from there.

25          And given the defendant's waiver, I find at this point

1    that the time in the speedy trial calculation between today and

2    the 14th is excluded from the speedy trial calculation.  And

3    then we'll figure out what happens next when I see what you all

4    think should happen next.

5         All right.  Mr. Smith, is there anything further I need

6    to do right now on behalf of Mr. Hamner?

7              MR. SMITH:  No, Your Honor.  Thank you.

8              THE COURT:  All right.  Mr. Collyer, anything further

9    on behalf of the government?

10             MR. COLLYER:  No, Your Honor.

11             THE COURT:  Okay.  All right.

12        Mr. Hamner, I really did appreciate your remarks and the

13   sincerity with which they were offered.  And I wish you and

14   your wife the best with all of your children.

15             THE DEFENDANT:  I apologize for -- making sure I

16   apologize to those officers.  That was definitely something

17   that I needed to do.

18             THE COURT:  All right.  Thank you.

19             THE DEFENDANT:  Thank you.

20                            *   *   *

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4          I, JANICE DICKMAN, do hereby certify that the above and

5      foregoing constitutes a true and accurate transcript of my

6      stenographic notes and is a full, true and complete transcript

7      of the proceedings to the best of my ability.

8                           Dated this 16th day of October, 2022

9

10

11                         _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25