# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-100 (RBW)** |
| **JACOB L. ZERKLE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jacob L. Zerkle to 34 months of incarceration, 12 months of supervised release, $2,000 in restitution, and a $200 special assessment. A 34-month term of incarceration is at the midpoint of the 31 to 37–month recommended Sentencing Guidelines range, as calculated by the government.

## I.       INTRODUCTION

The defendant, Jacob Zerkle, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

On January 6, Zerkle, who owns and operates a pistachio farm in Arizona, marched to the Capitol from the National Mall with members of the Proud Boys and eventually entered onto the west front of the Capitol grounds less than an hour after rioters first breached the restricted perimeter around the Capitol building. He then joined the crowd forming near the West Plaza, where he chanted "Hang 'em high" toward the Capitol building alongside other rioters. At 1:59 p.m., when a Metropolitan Police Department ("MPD") civil disturbance unit ("CDU") arrived at the Capitol to reinforce police defenses of the building, Zerkle and other members of the crowd attacked them, blocking the CDU from joining other police officers who were trying to protect the Capitol and its lawful occupants. This occurred at a critical moment just 14 minutes before rioters first breached the Capitol building approximately 50 yards away, at the Senate Wing Door. Dozens of rioters joined in this assault of the civil disturbance unit, but Zerkle was among the most aggressive: he yelled that the officers were traitors, grabbed and shoved them, repeatedly rammed into them, then called them traitors again when police finally expelled him back into the crowd of other rioters.

The government recommends that the Court sentence Zerkle to 34 months of incarceration for his violations of 18 U.S.C. §§ 111(a) and 231(a)(3). A 34-month sentence reflects the gravity of Zerkle's conduct, but also acknowledges his admission of guilt.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 74, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Zerkle's Role in the January 6, 2021 Attack on the Capitol

#### *Travel to Washington, D.C.*

In advance of January 6, 2021, Zerkle traveled with his brother to Washington, D.C. by car from his home in Arizona in order to protest about "election integrity," departing Arizona on January 2 and arriving in the D.C. area on January 5. Final Presentence Investigation Report ("PSR"), ECF No. 79, ¶¶ 20, 31; Gov. Sent. Ex. 8. Speaking to FBI personnel prior to his arrest, Zerkle stated that leading up to January 6, "I wasn't going [to D.C.] to protest the election, I was going down there about election integrity. I was concerned about the elections in our country because of how everything felt here in Arizona." Gov. Sent. Ex. 8.

#### *Zerkle's Entrance onto Capitol Grounds*

On the morning of January 6, 2021, Zerkle traveled to the National Mall with his brother, where the two joined with a vocal group of approximately 75 to 100 individuals that included Proud Boys leaders Joe Biggs, Charles Donohoe, Ethan Nordean, and Zachary Rehl. While former President Trump's "Stop the Steal" rally was still underway, Zerkle walked with the group east from the Ellipse area adjacent to the White House, past the Washington Monument, to the west front of the U.S. Capitol building. As they proceeded toward and eventually around the building,

they shouted various chants, including "Whose streets? Our Streets," "Fuck Antifa," and "We will not comply."

As Zerkle and the group approached the Capitol, they paused, gathered together, and kneeled. Multiple layers of fencing bearing white "Area Closed" around the Capitol grounds were clearly visible from their vantage point.



*Image 1: Zerkle (circled in red) at the Peace Circle along the edge of Capitol grounds. Zerkle is facing east toward the Capitol. (Gov. Sent. Ex. 1).*

.



*Image 2: Another angle (looking northeast) of the crowd containing Zerkle (not pictured) kneeling at the Peace Circle. A portion of visible bike rack fencing is circled in red (Gov. Sent. Ex. 1).*

The group then circled around the north side of the Capitol, proceeding to the large plaza on the east side of the building before returning to the Peace Circle, where, at 1:00 p.m., individuals walking with the group at that time breached the Restricted Perimeter established on the west side of the Capitol. Zerkle reported that he and his brother broke away from the group at some point as it circled around the Capitol, prior to the breach near the Peace Circle.

Between 1:00 and 2:00 p.m., Zerkle entered the Restricted Area of the Capitol grounds through the Pennsylvania Walkway, the paved path leading from the Peace Circle to the West Plaza. He crossed onto the grass lawn on the northwest portion of Capitol grounds and joined other rioters on a paved walkway just north of the West Plaza. There, he and others watched as rioters flooded onto the nearby Northwest Staircase toward the first floor of the Capitol building. During this period, Zerkle joined the crowd in chanting, "Hang 'em high" toward the Capitol building.

### *Zerkle's Assault of Metropolitan Police Department Officers*

At approximately 1:50 p.m., MPD CDU 42—a 23-person squad wearing protective helmets and body armor—arrived on the northwest corner of Capitol grounds. They were there to reinforce badly outnumbered MPD and U.S. Capitol Police ("USCP") officers on the West Plaza, where a police line had been established using metal bike racks. A uniformed USCP officer, who wore a baseball cap and no body armor, met the CDU 42 officers as they exited their MPD vans and led the unit by foot to the West Plaza police line. This required the officers to take the pathway north of the West Plaza where Zerkle and other rioters had gathered and formed a dense crowd.



*Image 3: The approximate locations of CDU 42, Zerkle, and the police line on the West Plaza at approximately 1:55 p.m., when CDU arrived at the outskirts of Capitol grounds*

6

As the CDU 42 officers walked closer to the West Plaza, the crowd of rioters thickened. The officers assumed a two-column formation in which each officer held the shoulder pad of the officer in front of him. Their body-worn cameras recorded some of the rioters shouting at the officers, calling them "traitors" and "oath breakers." At 1:59:53 p.m., as one CDU 42 officer worked his way through this crowd, Zerkle cupped his hands over his mouth and loudly shouted "traitors" at the officers from feet away.



*Image 4: Zerkle shouting "traitors" at MPD CDU 42 officers at 1:59:53 p.m. (Gov. Sent. Ex. 2 at 1:04).*

At approximately 1:59:54 p.m., the crowd, including Zerkle, attacked the CDU 42 officers. Zerkle assaulted at least three officers during this altercation. Specifically, once the fight broke out, Zerkle first attacked MPD Officer B.S., then MPD Officer C.W., and finally MPD Officer C.B.



*Image 5: Zerkle and other rioters assaulting MPD officers at 1:59 p.m. (Gov. Sent. Ex. 3).*

Of the three officers, Officer B.S. was closest to the front of the column of officers and was the first to encounter Zerkle. BWC footage from B.S. and C.W. shows that at 13:59:56, Zerkle grabbed and shoved B.S. At 14:00:00, C.W. turned to assist B.S. as Zerkle shoved B.S. away and turned his attention toward C.W.



*Image 6: Zerkle shoves Officer B.S. at 14:00:00 (Gov. Sent. Ex. 4 – C.W. BWC).*

Officer C.B., who was positioned immediately behind C.W. and B.S., forcefully pushed Zerkle several feet back from the officers. Another rioter then struck C.B. in the head with a skateboard, and C.B. turned to subdue the other rioter. Meanwhile Zerkle cupped his hands over his mouth and yelled toward the three officers, then charged into C.W. and C.B.



*Image 7: Zerkle charges at C.B. and C.W. as C.B. grapples with rioter with skateboard (Gov. Sent. Ex. 5 – C.B. BWC)*

At 14:00:05, after Zerkle charged into C.B. and C.W., he grabbed and shoved C.W. until C.B. was again able to forcefully push Zerkle back toward the crowd. At 14:00:06, Zerkle regained his footing, faced toward C.B. and C.W., ran at the two officers, and threw his weight, shoulder first, into C.W.



*Images 8-9: (Top) Zerkle begins his second running charge at C.B. and C.W. (Gov. Sent. Ex. 5 – C.B. BWC); (Bottom) Zerkle throwing shoulder into C.W. as he charges at officers (Gov. Sent. Ex. 4 – C.W. BWC).*

At 14:00:08, after Zerkle had charged into him again, C.W. grabbed the back of Zerkle's jacket collar, spun Zerkle around so that he faced away from officers, then forcefully pushed Zerkle back into the crowd of rioters. After regaining his footing, Zerkle stood with the other rioters and yelled at the officers in CDU 42, calling them "traitors."



*Image 10: Zerkle yelling "traitors" at MPD officers at 14:00:28 p.m. (Gov. Sent. Ex. 6 – B.S. BWC)*

Shortly after Zerkle and other rioters were forced back into the crowd, CDU 42 officers formed a tight defensive circle in response to being fully encircled by rioters, who continued to hurl threats, epithets, and objects at the officers.



*Image 11: CDU 42 officers form defensive circle after becoming surrounded by rioters (Zerkle circled in red) (Gov. Sent. Ex. 3).*

Following this attack, and as the CDU 42 officers attempted to move south through the

crowd toward the West Plaza police line, rioters pressed in on the officers from all sides, stopping the officers from escaping the crowd.



*Image 12: Zerkle and other rioters surround CDU 42 officers trying to move toward the West Plaza (Gov. Sent. Ex. 7).*

Zerkle worked his way past other rioters to get closer to the officers. There, he lowered his shoulder and, together with other rioters, pushed into the CDU 42 officers and blocked their ability to move forward or retreat.



*Image 13: Zerkle (circled in red) pushing against CDU 42 officers with other rioters who had encircled the officers (Gov. Sent. Ex. 7).*

12

Shortly afterward, police on the West Front deployed crowd control munitions and CDU 42 officers were able to reach the police line established behind bike rack barricades. The government is not aware of evidence indicating that Zerkle entered the Capitol or engaged in any additional assaultive conduct in the area.

### Zerkle's Statements to FBI Agents after January 6

When Zerkle spoke with FBI agents at his home regarding his conduct on January 6, 2021, he admitted to being on Capitol grounds, but downplayed his conduct as defensive in nature. He stated that he was "very, very vocal, and I was not nice," but that he was pushed into officers. "After that I just was trying to protect myself, and I probably did some dumb stuff. I was just – I don't know must have gone into, you know, flight or fight or whatever you call it." Gov. Sent. Ex. 8.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 25, 2022, a federal grand jury returned an indictment charging Zerkle with eight counts: three counts of violating 18 U.S.C. § 111(a)(1), and one count each of violating 18 U.S.C. § 231(a)(3), 1752(a)(1), (2), and (4), and 40 U.S.C. § 5104(e)(2)(F). ECF 7. On, October 30, 2023, Zerkle pled guilty to violating 18 U.S.C. § 111(a) (as charged in Count 3) and 18 U.S.C. § 231(a)(3) (Count 4) pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Zerkle now faces sentencing on Count 3 and 4 of the Indictment, charging him with violating 18 U.S.C. §§ 111(a)(1) and 231(a)(3), respectively.

As noted by the plea agreement and the Presentence Report, Zerkle faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000,

restitution, and a mandatory special assessment of $100 for violating 18 U.S.C. § 111(a)(1), and he faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for violating 18 U.S.C. § 231(a)(3).

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The revised PSR contains two errors. First, the revised PSR does not include a Guidelines analysis for both Counts—Counts Three and Four—to which Zerkle pleaded guilty. *See* PSR ¶¶ 41-49.[2] That Guidelines analysis follows:

Count 3: 18 U.S.C. § 111(a)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(c) | Cross Reference to § 2A2.2 | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a),(b) | Official Victim Adjustment | +6 |
| | **Total** | **20** |

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 38) that Counts 3 and 4, but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

<u>Count 4: 18 U.S.C. § 231(a)(3)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | +3 |
| U.S.S.G. § 2A2.4(c) | Cross Reference to § 2A2.2 | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a),(b) | Official Victim Adjustment | +6 |
| | **Total** | **20** |

*See* Plea Agreement at ¶¶ 5(A).

The revised PSR's second error is its conclusion that Counts 3 and 4 group under U.S.S.G. § 3D1.2(b).[3] PSR, ¶¶ 37-38. The draft PSR originally stated that because Count 3's offense level calculation includes a cross reference to Count 4 under U.S.S.G. § 2A2.4(c)(1), Counts 3 and 4 should be grouped under U.S.S.G. § 3D1.2(c), which provides that counts should be grouped when one count is treated as a specific offense characteristic in or adjustment to another count's offense level calculation. The government objected to this conclusion, however, because Application Note 5 to U.S.S.G. § 3D1.2 states that a "cross reference to another offense guideline does not constitute 'a specific offense characteristic . . . or other adjustment' within the meaning of subsection (c)."

Accordingly, the revised PSR responded by removing the conclusion that Counts 3 and 4 grouped under U.S.S.G. § 3D1.2(c). But the revised PSR then added an alternative basis for grouping Counts 3 and 4. It concluded that grouping was appropriate under U.S.S.G. § 3D1.2(b), which provides that counts should group when they "involve the same victim and two or more acts

---

[3] The government acknowledges that the Court addressed this issue during the Oct. 31, 2023 plea hearing in this matter and announced that the Court would find that Counts 3 and 4 group. The government respectfully maintains that these counts should not group and submits its written position for the record and for the Court's consideration at sentencing that Counts 3 and 4 do not group under U.S.S.G. § 3D1.2(a), (b), or (c).

or transactions connected by a common criminal objective or constituting part of a common scheme or plan." The revised PSR justified this new basis for grouping by citing to Application Note 2 to U.S.S.G. § 3D1.2, which provides: "The term 'victim' is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim." Citing this, the revised PSR concludes that Officer B.S. was the primary victim of Count 4, because "Count 4 was effectuated via the assault on officer B.S. as charged in Count 3." This is incorrect. The indictment charges that only MPD Officer B.S. was the victim of Zerkle's Count 3 assault. ECF 7 (Indictment) at 3-4. However, he is only one of the three victims of Zerkle's impeding of police officers during a civil disorder, as charged in Count 4. The other two are MPD Officers C.B. and C.W. *Id*. at 4.

Thus, Counts 3 and 4 have one overlapping victim but Count 4 has two additional victims. Because Count 4 involves harms to victims that Count 3 does not, those two offenses implicate different "harms" for purposes of grouping. *See United States v. Simmons*, 649 F.3d 301, 304 (5th Cir. 2011) (where defendant was convicted of thirteen counts of using a cellular telephone to make bomb threats, those counts did not group because he "directly threatened the individual call recipients" showing that "he meant to impart terror on those individuals, and therefore those threats constituted separate harms that did not require grouping"); *see generally United States v. Melchor-Zaragoza*, 351 F.3d 925, 928 (9th Cir. 2003) (affirming decision to treat each of the 23 hostages as separate groups where defendant was convicted of a single conspiracy to commit hostage-taking; the "23 victims who were held hostage suffered separate harms"). The relevant commentary to U.S.S.G. § 3D1.2 states:

A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would

argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims.  Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. Counts involving different victims … grouped together only as provided in subsection (c) or (d).

U.S.S.G. § 3D1.2, cmt. background.

The revised PSR is also incorrect to assert that Officers C.B. and C.W. are merely "indirect" or "secondary" victims of Zerkle's violation of 18 U.S.C. § 231(a)(3) charged in Count 4. In the final PSR, the Indictment, and the Statement of Offense, Officers C.B., B.S., and C.W. are all identified on equal footing as victims of Count 4. ECF 79, ¶ 22; ECF 7 at 4; ECF 74, ¶ 9. The revised PSR's conclusion that Count 4 involved a single primary victim is inconsistent with that document's own description of the Offense Conduct:

> Zerkle intentionally made physical contact with at least three officers: Officer [B.S.], Officer [C.B.], and Officer [C.W.]. This contact included Zerkle placing his hands on officers' persons and forcibly pushing these three officers with his hands.

ECF 79, ¶ 22 (emphasis added). Because there are three victims of Count 4, U.S.S.G. § 3D1.2(a) and (b) do not provide a basis to group it with Count 3.

**Grouping**

Under the grouping rules, as the government asserts above, Counts 3 and 4 constitution separate groups. The offense level of each is 20. U.S.S.G. § 3D1.3. Each counts as a separate unit, for a total of 2 units, and a 2-level increase in the combined offense level U.S.S.G. § 3D1.4. The combined offense level is therefore 22, before acceptance of responsibility.

The remainder of the Guidelines calculation would then be as follows:

| | |
|---|---|
| **Combined Offense Level** | **20** |
| Grouping (U.S.S.G. § 3D1.4) | +2 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **19** |

The government concurs with the PSR's conclusion regarding U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Zerkle plainly used violence in connection with the offense. As provided most clearly in the video exhibits described above, Zerkle aggressively, repeatedly, and violently attacked police officers. His conduct was unambiguously violent: Zerkle repeatedly charged at officers, throwing his body weight into them, while grabbing and shoving the officers. His intent behind the assault was equally clear: Zerkle watched officers work through the crowd toward the Capitol building, he yelled at them that they were "traitors," he attacked them, and then he again called them "traitors."

Zerkle's attack fits squarely within the definition of the term "use violence" in Section 4C1.1 as interpreted by other courts within this district. *See United States v. Gundersen*, 21-cr-137 (RC); *United States v. Dillard*, 23-cr-49 (JMC); *United States v. Baquero*, 21-cr-702 (JEB). Judge McFadden's recent ruling in *United States v. Bauer*, 21-cr-386, ECF No. 195 (D.D.C. Jan. 29, 2024) is particularly instructive. The court declined to apply § 4C1.1 where "the defendant shoved [an officer] and yelled, 'You back up! Don't even try,' when [the officer] tried to move her and other rioters away from the hallway leading to Speaker Pelosi's suite." *Id.* at 2. The court concluded that the defendant's conduct "falls within the plain meaning of 'violence.'" *Id.* at 5. Zerkle's conduct was even more violent. He did not just shove officers; he charged at them and

engaged in hand-to-hand combat with them. And just as in *Bauer*, Zerkle's "vehement tone and abusive language emphasized the seriousness of [his] physical actions against [officers]." *Id.*

In Zerkle's objections to the draft PSR, ECF No. 78 at 2-3, he asserts that his admission in the Statement of Facts to "forcibly pushing" officers does not establish that he used violence. The government disagrees. Zerkle admitted to intentionally making physical contact with the officers that "included … forcibly pushing" while calling the officers "traitors" during the encounter. ECF No. 74, ¶ 9. That alone is sufficient to establish that Zerkle used violence in relation to his violations of Sections 111(a) and 231(a)(3). Even if that alone were not enough, the Court is not constrained to only consider what Zerkle admitted to in the parties' Statement of Facts. As described above, the video evidence makes plain the violence of Zerkle's attack on officers. He grabbed, pushed, and shoved officers, then he charged into officers, backed up, and charged again into them. That violence precludes Zerkle's eligibility for Section 4C1.1 by a preponderance of the evidence.

Finally, the U.S. Probation Office calculated Zerkle's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of Zerkle's total adjusted offense level, after acceptance of responsibility, at 19, Zerkle's Guidelines imprisonment range is 30–37 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Zerkle's felonious conduct on January 6,

2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. He breached the restricted perimeter on Capitol grounds, yelled at officers that they were traitors, then repeatedly and doggedly attacked the officers as they sought to reinforce the Capitol's defenses at a critical point in the day. The nature and circumstances of Zerkle's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 34 months.

First, the nature of Zerkle's conduct was monumentally brazen. He attacked police officers in broad daylight as the officers worked their way through a dense, hostile crowd in which they were grossly outnumbered. He engaged the police in hand-to-hand combat, and then when the officers attempted to shove him away, he responded by charging back into them, and when they pushed him away a second time, he charged back with even more force. He attacked the officers as they attempted to fend off multiple other attacks happening simultaneously, making them all the more vulnerable. And when the officers attempted to flee from the crowd to the police line nearby, Zerkle joined others in the crowd in pressing in on the officers and preventing their escape.

The surrounding circumstances greatly compound the gravity of Zerkle's offense conduct. This attack occurred on the afternoon of January 6, 2021 while Congress was meeting to certify the results of the 2020 presidential election. And the attack occurred just outside this meeting place, the U.S. Capitol, within the restricted perimeter surrounding the Capitol that Zerkle and thousands of others breached and overran. This backdrop against Zerkle's attack was not coincidental; it was his chief motivation. When Zerkle encountered the officers, he observed them walking deeper into the crowd, toward the center of the west front. It was apparent that these officers were on Capitol

grounds to defend the Capitol. Apparently recognizing that, Zerkle yelled at the men that they were "traitors"—implying that they were betraying their country by defending the Capitol.

A mob's power is in its numbers, and Zerkle contributed to the mob's destruction as did its other willing participants, but Zerkle's individual contribution to the infamous disruption of the joint session of Congress that day is not abstract or speculative. Rioters first breached the restricted perimeter at approximately 1:00 p.m. on the west front of Capitol grounds. Police formed a defensive barricade of bike racks on the West Plaza, and they quickly became overwhelmed and called for additional units in the area to respond. The three officers Zerkle assaulted responded to the Capitol at approximately 1:55 p.m., and Zerkle assaulted the men at 1:59 p.m. as they made their way to reinforce the West Plaza barricade. The three officers and most of the unit became trapped in the crowd for several minutes, unable to reach the police line. Just off the northwest corner of the West Plaza police line, rioters overran officers, scaled the Northwest Stairs near where Zerkle's assault occurred, and breached the building through the Senate Wing Door at 2:13 p.m. The Senate adjourned almost immediately in response, and the House followed shortly after. Zerkle assaulted officers at a critical time and place when their presence was sorely needed elsewhere.

### B.  Zerkle's History and Characteristics

Zerkle served in the United States Navy as a machinist mate from 1992 until 1994, when he received an honorable discharge. In 1996, he was convicted of driving under the influence of alcohol. He and his domestic partner currently own and operate a small farm in southeast Arizona.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Zerkle's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Zerkle's conduct evinced his willingness to engage in serious political violence against sworn officers defending the U.S. Capitol and the elected officials operating within it. A term of incarceration reflecting the unconscionability of such an attack is necessary and appropriate here to ensure that Zerkle does not engage in such conduct again in the future.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.")

23

(statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Zerkle's conduct is comparable to that of Grady and Jason Owens, Case No. 21-cr-286 (BAH), who participated in the same assault of MPD CDU 42 officers making their way to the West Plaza. When the crowd attacked the CDU 42 officers at 2 p.m., Jason Owens, Grady's father, shoved officers and struck one, Officer N.D., around the chin, while Grady Owens, at the time a 20-year-old college student, struck Officer C.B. in his upper-right torso with a skateboard. Their assaultive conduct was in several respects very similar to Zerkle's, though their case also differs from Zerkle's in that both men later unsuccessfully attempted to enter the Capitol building but were blocked by police. Grady Owens's Sentencing Guidelines range for violating 18 U.S.C. § 111(a) and 40 U.S.C. § 5104(e)(2)(D) was 37-46 months of incarceration, and Judge Howell

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentenced him to 37 months. Jason Owens's Sentencing Guidelines range for violating Section 111(a) was 24-30 months of incarceration, and Judge Howell sentenced him to 27 months.

Similarly, in *United States v. Creek*, 1:21-cr-645 (DLF), the defendant pushed through a barrier, ran through the front of the crowd, and grabbed a police officer and drove him backward forcefully several feet through the West Plaza, then hit him in the face shield of his helmet. Creek then gave another officer a hard shove in the shoulders and kicked him, causing the officer to fall backward to the ground. Judge Friedrich sentenced Creek to 27 months' incarceration, the middle of the applicable Sentencing Guidelines range.

Another comparable West Plaza assault of police officers occurred in *United States v. Copeland*, 21-cr-570 (APM), where the defendant fought with officers on the West Plaza by engaging in a push-and-pull struggle over bike rack barricades used by officers on the West Plaza to establish their police line, and he attempted to use the bike racks as a weapon by thrusting them onto officers. While Copeland attempted to use a large, metal object to injure officers, his conduct is also comparable to Zerkle's in that he did not enter the Capitol building but nonetheless assaulted multiple officers on the west front of Capitol grounds. Judge Mehta sentenced Copeland to 36 months' incarceration, with a recommended Guidelines Range of 46 to 57 months.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case have not identified any bodily injury suffered as a result of Zerkle's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Zerkle must pay $2,000 in restitution, which reflects in part the role Zerkle played in the riot on January 6.[8] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Zerkle's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 34 months of incarceration, 12 months of supervised release, $2,000 in restitution and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   _/s/ Hutton Marshall_____
J. HUTTON MARSHALL
KATHERINE E. BOYLES
Assistant U.S. Attorneys
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov