### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 22-cr-100-RBW |
| | : | |
| v. | : | |
| | : | |
| JACOB L. ZERKLE, | : | |
| *Defendant*. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

On January 6, 2021, Jacob Zerkle came to Washington, D.C. from Arizona to participate in a political protest. Early that morning, he walked up and down the National Mall. He visited Arlington National Ceremony, the Lincoln Memorial, the Washington Monument, and the United States Capitol (multiple times). He took photographs, talked with fellow visitors to the city, marched, heard speeches, and joined protests that had been organized weeks prior and were the subject of permits granted throughout the National Mall and on certain areas of the United States Capitol Grounds.

Later that afternoon, certain protests became violent, and numerous individuals broke windows and forced their way through doors to breach the United States Capitol, which was closed to visitors. While inside, the individuals destroyed property, stole items, assaulted and harassed law enforcement officers, and threatened members of Congress (and their staffs), requiring them to shelter in place in fear for their safety. Multiple protestors and law enforcement officers died from heart attacks, and one protestor was killed when trying to enter a hallway that led to the Senate floor. In the wake of the events, at least four law enforcement officers who were present at the Capitol committed suicide.

Nobody, especially not Mr. Zerkle, is disputing that January 6 was an extremely dark day in our nation's history and a national embarrassment. But, Mr. Zerkle never went into the U.S. Capitol that day and never endorsed or celebrated the actions of people who did. While three thousand individuals entered the building, Mr. Zerkle and his brother went the opposite direction and started their journey back home to Arizona, because, in Mr. Zerkle's words, that was not why he came to Washington, D.C. Again, to be clear, Mr. Zerkle *never* went into the U.S. Capitol, *never* intended to enter, and *never* attempted to enter. He did not steal or deface any property outside, and did not have a weapon in his possession or try to use anything as a weapon when contacted by law enforcement.

Consistent with Mr. Zerkle's factual proffer (as drafted by the Government), during the protests occurring outside the U.S. Capitol, a physical altercation occurred between protestors and members of the Metropolitan Police Department ("MPD") Civil Disturbance Unit ("CDU"). Mr. Zerkle did not initiate the physical encounter, nor did he kick or hit any of the officers. Instead, as the CDU attempted to push through a dense crowd, Mr. Zerkle pushed up against officers and pushed back when he was pushed and when his brother was trapped between officers and protestors in the middle of a skirmish. While Mr. Zerkle ended up on the ground, after trying to cover his head and avoid being hit, no officer was injured because of any of Mr. Zerkle's conduct. In the last photograph taken of Mr. Zerkle on January 6, 2021, he is leaving the Capitol grounds to go home, while the rest of the crowd went in the other direction, aiming to enter the Capitol building.

At all times since January 6, 2021, Mr. Zerkle has cooperated with law enforcement and the Government. While home in Arizona, he spoke to law enforcement on two separate occasions, admitting to being present outside the U.S. Capitol, describing his actions on that

day, and identifying himself in photographs shown to him. He participated in a debrief with prosecutors remotely in Washington, D.C. pursuant to a written debrief letter, executed a written consent to allow law enforcement to access certain social media accounts, voluntarily disclosed photographs taken on January 6, and offered to provide the clothing that he wore that day. On January 7, *2022*, prior to even being arrested or charged, Mr. Zerkle, through court appointed counsel, offered to plead guilty to a misdemeanor simple assault offense for resisting law enforcement during his brief encounter with them outside the U.S. Capitol. The Government declined the offer and, weeks later, charged and then indicted Mr. Zerkle on multiple felony offenses. Ultimately, Mr. Zerkle pleaded guilty to two felony offenses, the only plea offer the Government (and its current prosecutors) would accept to resolve this case in lieu of trial.

Now, the Government seeks a sentence of thirty-four months of incarceration, even though Mr. Zerkle did not punch or kick any officer and never went inside the U.S. Capitol, and despite this Court's previous ruling that Mr. Zerkle's two-felony convictions group and, therefore, limit his guidelines range to 24 to 30 months. Indeed, the Government seeks nearly three years of incarceration even after hundreds of individuals who *actually entered* the U.S. Capitol received probationary sentences or minimal days of incarceration, and when those convicted and sentenced for obstruction of an official proceeding may ultimately have their felony convictions vacated by the United States Supreme Court and have their sentences reduced to time served.

As discussed below, Mr. Zerkle is a zero criminal history point offender and has no history of violent or assaultive conduct and his criminal history consists of a prior conviction for a traffic offense and disorderly conduct (from 25 years ago). He lives on a self-sustaining

solar-powered farm, where he tries to make ends meet growing pistachios with his life partner of over 25 years. He is not involved in any radical militia groups or associated with any group responsible for the attack on the U.S. Capitol. He has no social media presence. After growing up in absolute poverty and moving some twenty-four times as a child, Mr. Zerkle became the first sibling among thirteen to graduate high school. He served honorably in the United States Navy and has maintained steady employment his entire life. Since his arrest nearly two years ago, Mr. Zerkle has been in 100% compliance with his release conditions.

Mr. Zerkle's conduct on January 6, 2021, where he never encroached on or entered the U.S. Capitol building and never hit or kicked law enforcement officers, does not warrant a sentence of incarceration in this case, particularly when considered together with his complete cooperation with the Government from the earliest possible moment, his sincere acceptance of responsibility, and the absence of contacts with the criminal justice system for 25 years. As expressed by his life partner, family, friends, and fellow farmers in the two dozen letters submitted on his behalf, Mr. Zerkle's contributions to others, acceptance of responsibility, and good deeds warrant leniency and an opportunity to prove to this Court, through a lengthy period of supervision, that he is someone who can atone for his actions and continue to be a beneficial person to his family and farming community.

This Court has often asked in January 6 cases how it can explain to other countries the sentences assigned for actions that occurred on January 6, 2021. The answer is clear. In our country, we judge a man by *his* actions alone, not those of others; we evaluate one-day in a man's life, alongside all the other days in his life; we reward those who sincerely accept full responsibility for their actions; and we value actions taken to cooperate with the Government

in its investigation and prosecution. These values, which separate this country from so many other countries, support a sentence of probation in this case.

## FACTUAL BACKGROUND

### <u>Personal Life and Family History</u>

Jacob Zerkle is 53 years of age and was born in Wilcox, Arizona as the seventh of thirteen children. *See* Presentence Report ("PSR"), ¶¶ 59-60 (D.E. 79). He grew up extremely impoverished. *Id.* ¶ 62. His father was always "searching for something better," causing the family to move approximately twenty-four times before Mr. Zerkle reached the age of eighteen. *Id.* Despite the frequent moves, there was no change to the family's "socio-economic" status and all of their homes lacked electricity and plumbing. *Id.* When they had to use the bathroom, they would just find a place outside, and they bathed once a week, also outside*. Id*. Mr. Zerkle did not experience indoor plumbing until the age of thirteen. *Id.* He and his siblings rarely had different clothes — wearing the same clothing for days at a time and sometimes having to go without shoes. *Id*. Although Mr. Zerkle and his siblings were not malnourished, he "never felt there was enough." *Id.* ¶ 63. Because of his family's status and their reputation for being poor and disheveled, Mr. Zerkle and his siblings were consistently harassed by other kids at school, when they in fact attended. *Id*. ¶ 62.

Mr. Zerkle's home as a child was "chaotic." *Id.* ¶ 61. His "father was physically and verbally abusive" and "emotionally unstable" — he spent most days in a bad mood and angry, and, on the rare occasion that he was in a good mood, he would eventually end up crying uncontrollably. *Id*. Mr. Zerkle did not receive much support from his mother either, as she was "very cold" and never showed love or affection. *Id.* As a result, he was primarily raised by his older sister Catrina "Trina," who was more of a mother to him than his own mother. *Id.* She

showed him affection and helped raise him, and they still have a close bond to this day. *Id.*
Unfortunately, when he was six or seven years old, Trina left the family home after getting
married and Mr. Zerkle felt very alone. *Id.*

Mr. Zerkle's parents never celebrated birthdays or Christmas and were overall
disengaged from the lives of their children. *Id.* ¶ 63. At one point, Mr. Zerkle stopped attending
school and his parents did not care. *Id.* Mr. Zerkle and his siblings also did not have a
relationship with their grandparents because they were never accepted and were disowned. *Id.*
¶ 64. At age 16, Mr. Zerkle moved out of the family home to live with two of his brothers,
Jack and Thomas. *Id.* ¶ 65. After he moved out, he was much happier and started attending
school again, eventually graduating from high school. *Id.* ¶¶ 65, 80. Mr. Zerkle briefly attended
community college before enlisting in the United States Navy, where he served honorably for
two years. *Id.* ¶¶ 80-82. Photographs of Mr. Zerkle at the age of thirteen in a family picture
and while in the United States Navy are below:



In 1997, Zerkle met Stella Laferriere, who is fifteen years his senior. *Id.* ¶¶ 66-68. While
the pair never married, they have shared a lasting relationship for over 26 years. *Id.* Mr. Zerkle

does not have any biological children, but enjoys a good relationship with Ms. Laferriere's three children, who were adults when Mr. Zerkle first met them. *Id.* Mr. Zerkle has also been a step-grandfather to Ms. Laferriere's seven grandchildren and a step great-grandfather to Ms. Laferriere's five great grandchildren. *Id.* Below are photographs of Mr. Zerkle, Ms. Laferriere, and her family:







Since 2011, Mr. Zerkle and Ms. Laferriere have owned a farm located on East Fan Road in Bowie, Arizona, which they operate as Sage Farm, LLC. *Id.* ¶¶ 70, 84. The farm, shown below, is self-sufficient with water and solar panels for electricity:



Mr. Zerkle and Ms. Laferriere reside in a home on the property that they built from scratch. The home has little if any resale value, as it was built without permits (a practice allowed by Arizona law) and thus is not up to code, preventing it from being resold.

### Work Experience

Mr. Zerkle has worked his entire life to support himself, his partner Ms. Laferriere, and his large family, often helping them out when they had nowhere else to turn. *Id.* ¶¶ 82, 83-90. Since his honorable discharge from the United States Navy, Mr. Zerkle has worked as a long-haul truck driver, a salesman, a landscaper, a roofer, and, most notably, a farmer. *Id.* For the last thirteen years, Mr. Zerkle has performed seasonal work for other farms, while working with Ms. Laferriere to develop their farm. *Id.* ¶¶ 84-85. As discussed in numerous letters submitted on his behalf, after extensive hard work over the years, Mr. Zerkle has just come to make the farm profitable. *Id.* at ¶¶ 100-101.

Although Mr. Zerkle has limited expenditures, as the farm generates power and water and provides other resources, he also has very limited income and savings. In 2022, Mr. Zerkle earned $2,845, mostly from seasonal work performed for Bowie Pecans, another farm company, while Sage Farm lost $6,852. *Id.* ¶ 84. Mr. Zerkle is hopeful that the farm can make a profit this year from the 4100 pounds of pistachios that were recently harvested. *Id.*

## Acceptance of Responsibility

Since the events of January 6, 2021, Mr. Zerkle has cooperated with law enforcement. Before he was arrested or charged, he spoke to law enforcement twice in Arizona, without the presence of counsel. During those conversations, he acknowledged his presence in Washington, D.C. on January 6, 2021, identified himself in photographs shown to him, and provided a description of where he was and what he did that day.

After obtaining court appointed counsel through the Criminal Justice Act, as he was found to be indigent, Mr. Zerkle entered into a debrief agreement with the Government. He appeared at a virtual debrief on December 13, 2021, more than two years ago. After the debrief, he voluntarily produced pictures of himself taken on January 6, 2021, and even offered to provide the clothing he wore that day to the Government. Mr. Zerkle also provided logins and his best recollection of the passwords for old social media accounts that he had used years earlier and subsequently abandoned.

Still prior to being charged or arrested, Mr. Zerkle, through counsel, notified the Government that he would plead guilty to a misdemeanor simple assault offense, because his conduct consisted of pushing and shoving that did not result in any injury to anyone. The Government refused that offer, insisting that he plead guilty to a felony offense. When Mr. Zerkle finally agreed to plead to a felony offense in advance of the scheduled trial, the

Government then insisted that he plead to two felonies for the same conduct, which would increase his guideline range under the Government's theory. When Mr. Zerkle nonetheless agreed to plead to two felonies, the Government asked him to agree that the offenses did not group, thereby further increasing his guidelines, even though he is a zero-point offender. Mr. Zerkle refused because the offenses do not group under the facts and existing law, as agreed to by this Court and United States Probation when examining this case.

None of this undermines the fact that since January 6, 2021, Mr. Zerkle has regretted his actions on that day and has shown sincere acceptance of responsibility for those actions, which is memorialized in his letter to the Court (*see* A1-A3):[1]

> The crowd was angry and people were pushing. I saw my brother was in a bad position and I was concerned about him and rushed to where he was, and pushed officers in the process. I regret doing that. It was never my intention to have any physical contact with anyone. I also deeply regret repeating the chants of the crowd. I am embarrassed that I said them. I did not even believe I said them until I heard the videos produced by the Government. My immediate reaction was embarrassment and shame. I clearly lost control and got caught up in the moment.

> Once I was reunited with my brother, we began the process of walking away. As we walked away from the Capitol, we looked back to see multiple people climbing up on the Capitol stairs. I was shocked. That was not what I came to do. I am embarrassed to have been a part of that. I am ashamed in the part I had in it. What happened on January 6 is not who I am.

Accompanying this submission are numerous letters of support from Mr. Zerkle's family, friends, and coworkers (A4-A34), which similarly attest that he is a caring and thoughtful person, remorseful for his actions, and deserving of leniency in this case. A short

---

[1] Accompanying this submission is an Appendix that contains certain character letters submitted on behalf of Mr. Zerkle. Each page bears a bates stamp number beginning with the letter "A" and is referenced throughout this submission.

summary of some of these letters highlights the history and characteristics of Mr. Zerkle that should be considered by this Court in fashioning an appropriate sentence in this case:

### Stella Laferriere (A4-A7)

Jacob and I have been together for 28 years. . . . Jacob has always worked hard for us to have a better life. He built our home and has planted our orchard little by little over the years . . . The everyday struggles his whole family went through and his family trying to make ends meet just to put food on the table. So as an adult he has tried to break that cycle. . . . The thought of having to go to prison and leaving me behind by myself to take care of our home and orchard especially since it has barely started to finally pay for all our had work and time to get us here, has been stressful. . . . I would never want or could imagine being in your shoes and making difficult decisions about people's lives. People that come and go through your court. I can truly tell you this has been a hard lesson. Not only for Jacob, but me as well.

### Frank Zerkle (A9)

He has always been a source of support for me. When my wife Arlayna developed a brain tumor in 2010 and was going through a lot of medical issues, Jacob provided a place for us to stay and recuperate. When she passed in 2015, Jacob was the one who showed up for me.

### Andre Ransom (A8)

I lived with Jacob and my grandma Stella for quite some time. . . . Through this time Jacob played a big role in my upbringing giving me advice and taking the time to explain the more important things in life not only in society but as man. Lessons that I'll take and use through my life until I depart. He is always willing to help those he considers near and dear to him.

### Tina Ashman (A10)

Jacob . . . is a good brother to me and all the rest of his siblings . . . I don't know of anyone that would have anything bad to say about him. Jacob contributes on many levels, and if incarcerated would no longer be able to do so. I beg you to please have mercy on my little brother Jacob and allow him to return home to his family, friends, and his farm.

### Christopher Frazier (A11)

Jacob is [] a respected farmer, who takes pride in his work and produces quality crops. He contributes to the local economy and the food security of our region.

He is an asset to our society and a role model for many. I was shocked and saddened to learn of Jacob's involvement in the Capitol riot on January 6th, 2021. I do not condone his actions or his participation in such a violent and unlawful event. However, I also know that Jacob is not a violent or malicious person by nature. . . . I respectfully ask you to show leniency and mercy to Jacob when you issue your sentence. He has already suffered a lot from the consequences of his mistake, such as losing his reputation, his income, and his freedom. He has also cooperated fully with the authorities and accepted responsibility for his actions. He is eager to make amends and rebuild his life.

### Colleen Frasier (A13)

I believe it is crucial for the court to consider the entirety of his character and not solely the single incident for which he is being sentenced. Jacob has exhibited resilience in facing life's challenges and has demonstrated a willingness to support others, both within our family and his community. Notably, he overcame a challenging upbringing, served honorably in the military, and transformed his life into one of purpose and achievement. I acknowledge Jacob's unwavering dedication to his work, particularly in building a pistachio farm from the ground up. His consistent demonstration of a strong work ethic and a profound sense of responsibility is a testament to his character. While I understand the gravity of the charges against Jacob, I do not intend to diminish their seriousness. Instead, I implore the court to consider the broader context of his life, including his honorable military service and the exemplary way he has conducted himself throughout his 50-plus years of history.

### Joshlin Zerkle (A19-A20)

When the Zerkles moved to Bowie, they lived in an old school bus on a small piece of property with a shop. Some of the boys slept in the shop. The Zerkles did not have much of anything and were often teased and made fun of because of the way they lived or dressed. Often times their clothes had holes, did not fit, or had grease stains on them. . . . . The Zerkles are honest hard working individuals that look out for each other. I got to witness Jacob looking out for his younger brother Levi. . . . he was the first in his family of thirteen to graduate from high school. Once Jacob received his diploma, he enlisted in the navy and proudly served our country.

### Oscar Hernadez (A30)

Jacob Zerkle is a small pistachio farmer, just like myself, and he's also a mechanic. Jacob Zerkle helps other farmers as well when it's time to harvest their crop. I have to say that we need more people like Jacob Zerkle and us small

farmers to keep farming and putting food on people's tables. We all work together, as one, and help each other during hard times.

## The Nature and Circumstances of the Charged Offenses

As set forth in his statement of offense, Mr. Zerkle physically engaged with law enforcement and impeded the officers' ability to focus their resources on other events that were occurring at the Capitol. But, the video evidence from that day makes clear that Mr. Zerkle's actions were primarily taken out of concern for his older brother, who was trapped between law enforcement and other protestors and whose safety was in jeopardy, as well as to protect himself from being pushed by others in the crowd. A careful review of the video is necessary, not to challenge the charges that were brought or to undermine Mr. Zerkle's guilty plea, but rather to put Mr. Zerkle's actions in the proper context, *vis a vis*, all of the other violent actions that occurred on January 6, 2021, and to highlight why a sentence of 34 months is wholly disproportionate to the conduct and completely inconsistent with how protestors resisting law enforcement are punished in this country.[2]

### *Gov't Proposed Trial Ex. 414 (6:26 of 25:08)*

In the screenshot below, Mr. Zerkle and his brother are behind protestors who initiated engagement with MPD's CDU. As evidenced by the upper right corner of the screenshot, no one had gone up the stairs to the U.S. Capitol at that time.

---

[2] Nowhere in the statement of offense does it state that Mr. Zerkle engaged in "hand to hand combat" with law enforcement, as the Government's sentencing memorandum erroneously claims. *See* Gov't Sent. Mem. at 20 (D.E. 82). It does not because it did not happen. The Government cannot show a single photo or video of any punch or kick, and the entire statement of offense (drafted by the Government) discusses "pushing." The Government has an obligation to adequately report the offense conduct in its sentencing memorandum. That has not occurred in this case.



*Gov't Proposed Trial Ex. 412*

Mr. Zerkle and his brother are behind protestors who made initial contact with officers.



*Gov't Proposed Trial Ex. 410*

The Government's proposed trial exhibit 410 (at 4 seconds) shows Mr. Zerkle entering the path where his feeble older brother was located, after other individuals initiated contact with law enforcement:

14



*See* Gov't Ex. 410 (at 9 seconds) (Mr. Zerkle's brother pops up from being sandwiched between officers and protestors):



*See* Gov't Ex. 410 (at 9 seconds) (Mr. Zerkle's brother's head is visible, with his arm up sandwiched between officers and protestors, while Mr. Zerkle is bent over next to him wearing a backpack):



*Additional Video Footage*

Consistent with the Government proposed trial exhibit 410, body worn camera ("BWC") video also shows Mr. Zerkle's brother caught between riot police with metal ASP batons and other protestors:[3]



Another video produced by the Government, but removed from the Government's amended trial exhibits, further highlights how Mr. Zerkle's actions were primarily motivated by the safety of his brother.[4] At 4:28 in the video, people are standing at an elevated position above the officers recording events on their cellphones and, in the background, there is no one proceeding up the stairs to breach the Capitol. Mr. Zerkle appears to be moving through the crowd to get to his brother:

---

[3] The Defendant's pretrial motions included screenshots from BWC footage showing Mr. Zerkle's brother caught between the police and protestors, and Mr. Zerkle's actions to get to his brother's location. *See*, *e.g.*, D.E. 28 at 9; D.E. 29 at 9.

[4] The video, HelpStopHate video_199677565356685.mp4video, can be accessed at: https://ia802303.us.archive.org/33/items/sNaSX3PGrfyzB9Bws/sNaSX3PGrfyzB9Bws.mpeg4, last visited February 15, 2023.



Seconds later, at 4:35, Mr. Zerkle's brother appears to be located right in front of armed

riot officers (facing away from them), while Mr. Zerkle is bent over in the opposite direction:



Two seconds later, at 4:37, Mr. Zerkle's brother again appears right in front of the officers, and in between the officers and protestors, while Mr. Zerkle is further bent over and facing in the opposite direction from the officers after just having been pushed in the back:



This sequence, showing Mr. Zerkle hunched over and then pushed and heading in the opposite direction of the officers, matches up to BWC video with the time stamp of universal time 2:00:09 p.m., which was minutes before any breach of police lines or the breach of the Capitol occurred:





Yet another second later, at 4:38, Mr. Zerkle's brother again appears right in front of officers, and in between the officers and the protestors, while Mr. Zerkle is now directing his focus towards his brother:



Approximately thirty seconds later, at 5:06, there is still no one is heading up the staircase attempting to breach the U.S. Capitol, and the individuals standing above the officers are still recording the events unfolding below. This undermines any claim by the Government that Mr. Zerkle's actions caused the breach.



***Gov't Proposed Trial Ex. 409***

At a pretrial hearing, the Government played video from proposed trial exhibit 409 that showed Mr. Zerkle engaged with law enforcement. What was not shown was that, at the time those events occurred, Mr. Zerkle's older brother had been swallowed by the crowd and was between law enforcement and other protestors, as confirmed in the summary of other video clips above. Only through a second-by-second review of this video is Mr. Zerkle's conduct put in its proper perspective.

*See* Gov't Ex. 409 (at 5:25 of 38:54) (the upper right corner reflects no protestor having gone up the stairs yet towards the Capitol as law enforcement are stationed there, while the middle of the screenshot reflects MPD riot police in a line moving toward the center of the crowd):



*See* Gov't Ex. 409 (at 5:30 of 38:54) (the line of officers continues to move through the crowd, while Mr. Zerkle and his brother are behind protestors that have initiated contact with the officers):



*See* Gov't Ex. 409 (at 5:38 of 38:54) (the camera pans back to the location of the officers and protestors after a multiple second lapse of view in the opposition direction, and Mr. Zerkle appears to be engaged with the officers, as one officer puts his arm up to the neck area of Mr. Zerkle; not pictured is Mr. Zerkle's brother, who is trapped beneath the officers and protestors to the right but will emerge shortly):



*See* Gov't Ex. 409 (at5:39 of 38:54) (one second later, Mr. Zerkle and law enforcement are further engaged):



*See* Gov't Ex. 409 (at 5:40 of 38:54) (an additional second later, Mr. Zerkle has his hands to his face, focused on the section where his brother is located):



*See* Gov't Ex. 409 (at 5:41 of 38:54) (Mr. Zerkle proceeds toward the section where his brother is located):



*See* Gov't Ex. 409 (at 5:42 of 38:54) (Mr. Zerkle's brother, wearing an American flag bandana, emerges from the group of protestors and law enforcement, where Mr. Zerkle had been heading the entire time):



*See* Gov't Ex. 409 (at 5:45 of 38:54) (Mr. Zerkle continues in the direction of where his brother is located):



*See* Gov't Ex. 409 (at 5:48 of 38:54) (Mr. Zerkle's brother emerges again, wearing his flag bandana):



See Gov't Ex. 409 (at 5:49 of 38:54) (Mr. Zerkle's brother starts the process of rejoining his brother):



See Gov't Ex. 409 (at 5:53 of 38:54)  (Mr. Zerkle's brother continues to make his way back to Mr. Zerkle):



*See* Gov't Ex. 409 (at 6:04 of 38:54) (all the officers are in position, and nobody is running up the stairs):



While Mr. Zerkle was wearing a leather jacket and khaki pants on January 6, 2021, the law enforcement officers that he encountered were wearing riot gear, with protective helmets, shields, and body armor, and each was equipped with an extended metal baton. Photographs of some of the officers in the riot battalion that pushed through the crowd, where Mr. Zerkle encountered officers for than thirty seconds, are shown below:



The last photograph of Mr. Zerkle from January 6, 2021 shows him heading away from the U.S. Capitol with his brother, while other protestors moved the opposite direction to attempt to breach and enter the U.S. Capitol:



As noted above, the universal time of the BWC video shows that Mr. Zerkle was pushed away at 2:00:02 p.m. A photograph from nearly a minute later shows police still in place to prevent a siege of the Capitol. This video screenshot is not provided to undermine what occurred on January 6, but rather to highlight that Mr. Zerkle's encounter with law enforcement was not the proximate cause of the subsequent breach of the Capitol building:



## ARGUMENT

**I.    The Sentencing Guidelines, Statutory Factors, and Other Considerations Support a Sentence Below the Guidelines.**

Mr. Zerkle faces sentencing on two felony counts, neither of which expressly requires this Court to impose a term of incarceration. Rather, the sentencing factors of 18 U.S.C. § 3553 require this Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Mr. Zerkle's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its appropriate place in the grand scheme of the criminal justice system.

### A.    Sentencing Discretion and Section 3553 Statutory Factors.

The Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* The Supreme Court in *Gall v. United States* outlined the process to follow:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, *after giving both parties an opportunity to argue for whatever sentence they deem appropriate*, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he *may not presume that the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented.

552 U.S. 38, 49-50 (2007) (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along with the other factors set forth in 18 U.S.C. § 3553(a) (*see Booker*, 543 U.S. at 260; U.S. Sentencing Comm'n, Guidelines Manual (Nov. 2023) (hereinafter, "USSG")), and treat the

Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Pursuant to 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." Further, under 18 U.S.C. § 3582, the court, in considering the factors in § 3553(a) and their applicability, should recognize "*that imprisonment is not an appropriate means of promoting correction and rehabilitation*." 18 U.S.C. § 3582(a) (emphasis added).

Although the guidelines range will generally align with the objectives of the § 3553(a) factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. *The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular cas*e. In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply.

552 U.S. at 109 (emphasis added) (citations and punctuation omitted).

As one district court has framed it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

**B.      Applicable Sentencing Guidelines Range.**

According to the Presentence Report writer, through application of Section 2A2.2 of the Guidelines (for assault offenses), Mr. Zerkle's offense level is 17 and, as a zero criminal history score offender, he has an advisory guidelines range of 24 to 30 months, which includes a six-level increase because the individual he pushed was a law enforcement officer.

U.S. Probation agrees that this Court correctly grouped both felony offenses in this case on the basis that they are comprised of the same conduct. *See* PSR, ¶ 38 ("Here, the interference with officer B.S. in Count 4 was effectuated via the assault of B.S. in Count 3."). In fact, a review of the video and photographs above makes clear that the Government is punishing Mr. Zerkle twice for the same conduct. This Court ruled on the issue before the plea hearing commenced and there is nothing in the record to warrant a reversal of that decision, when it is supported by additional case law from other January 6 cases, in addition to the findings of U.S. Probation. *Id.* ("Counts 3 and 4 group together pursuant to USSG § 3D1.2 (b), which provides that counts are to be grouped when counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."); *see also*, *e.g.*, *United States v. Michael Perkins and Joshua Doolin*, No. 21-cr-00447-CJN (D.D.C.) (grouping civil disorder and assault offenses); *United States v. Vincent Gillespie*, No. 22-cr-60-BAH (D.D.C) (same).

Contrary to U.S. Probation's conclusion, this Court should apply the sentencing reduction for zero-point offenders, under USSG § 4C1.1. As stated above, Mr. Zerkle has no criminal history points. The Sentencing Commission recently adopted a new sentencing reduction for such offenders to reflect a recognition that those with no prior criminal offenses are less likely to reoffend. Here, however, U.S. Probation found Mr. Zerkle ineligible for the

reduction, reasoning that by impeding law enforcement and pushing officers, he was allegedly using "violence and credible threats of violence." PSR, ¶ 48. Although drug dealers and fraudsters may obtain this sentencing reduction, Mr. Zerkle is purportedly ineligible given the nature of his offense. And, if he had been allowed to plead only to the civil disorder felony, U.S. Probation likely would have found him eligible for this sentencing reduction.

United States Sentencing Guideline § 4C1.1 directs the Court to decrease the offense level attributable to the defendant if, after examining the conduct of the specific offender and his individual actions, the defendant meets certain criteria. The only criterion purportedly excluding Mr. Zerkle is that "(3) the defendant did not use violence or credible threats of violence in connection with the offense." *See* USSG § 4C1.1(a)(3). Mr. Zerkle pleaded guilty to a violation of 18 U.S.C. § 111(a)(1), which can be based on conduct that is impeding and resisting without the use of violence or threats. Accordingly, an examination of the issue is not based on the offense of conviction or the Government's characterization of individuals outside the U.S. Capitol on January 6, but rather the underlying conduct.

As set forth in the Statement of Offense, Mr. Zerkle did not kick or punch any officer, did not possess a weapon, and did not threaten to inflict any physical injury upon any officer. Moreover, no officer was injured because of any contact with Mr. Zerkle. In a recent decision, the Sixth Circuit Court of Appeals interpreted the enhancement for "using violence" in the absence of a Guidelines definition and relied on Black's Law Dictionary and the Webster's Dictionary to conclude that the term violence "encompasses acts where one uses physical force with the intent to injure, regardless whether an injury actually occurs." *United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019); *accord United States v. Atkinson*, 815 Fed. App'x 704, 708 (4th Cir. 2020) (quoting *Pineda-Duarte*).

In this case, there was no intent to injure by words or actions, and pushing back or pushing forward does not indicate otherwise. The Statement of Offense's description of "forcibly pushing" accurately reflects Mr. Zerkle's offense conduct and is not by error, as it was drafted by the Government. The absence of any punch or kick or weapon is further evidence that there was no intent to injure. Mr. Zerkle leaving the area with his brother before the breach of the U.S. Capitol is also evidence of his lack of intent to injure anyone when impeding law enforcement. Moreover, as shown above, Mr. Zerkle's conduct was primarily motivated by his concerns for the safety of his brother, not by any intent to harm.

This Court recently applied a similar analysis in *United States v. Yang*, looking to the plain meaning of the terms "violence" and "credible threats of violence:"

> Neither § 4C1.1 nor other provisions in the Guidelines define the terms use violence or use credible threats of violence. And the D.C. Circuit has not interpreted these terms as used here. Accordingly, the Court will look to the plain meaning of the terms at the time of enactment. Contemporary dictionaries define violence as the use of physical force, usually accompanied by fury, vehemence, or outrage; especially, physical force unlawfully exercised with the intent to harm, or as the use of physical force so as to injure, abuse, damage, or destroy. These definitions draw additional support from case law interpreting violence in similar context to contextual evidence to determine whether a threat is credible.

No. 23-cr-100 (JDB), 2024 WL 519962, at *3-4 (D.D.C. Feb. 9, 2024) (citation and punctuation omitted).

The decision in *Yang* is particularly instructive because, in that case, the Court rejected the Government's proposed blanket exclusion of all January 6 arrestees from the zero-point offender reduction, as six other judges had already done. The Court then found that the defendant's conduct did not constitute "violence" as defined in the Guidelines and did not preclude application of the zero point offender reduction, even though the defendant had been

convicted of civil disorder, and made contact with officers twice, including grabbing an officer's baton. 2024 WL 519962, at *1-4. In permitting the reduction, the district court determined that such conduct did not evidence an intent to injure similar to that in cases cited by the Government where the sentencing reduction was denied:

> Even assuming Yang applied physical force insofar as he briefly made physical contact with two officers, the Court finds that this contact was not made with an intent to harm.
>
> . . .
>
> The § 4C1.1(a)(3) "violence" determination is necessarily case-specific. And the three cases cited by the government where courts declined to apply § 4C1.1 all involved much more aggressive conduct than that at issue here. *See*, *e.g.*, *United States v. Gunderse*n, Crim. A. No. 21-137 (RC), ECF No. 72, at 50 (July 25, 2023) (defendant "rushed [an officer] and forcefully slammed his heavy body into the officer's riot shield").

*Yang*, 2024 WL 519962, at *4 & n.4.

Denying the zero-point offender reduction in this case would create a precedent that, no matter if a defendant has zero criminal history points and survives nine other exclusions, a two-level reduction is never permitted if he or she pushes or somehow otherwise impedes a federal law enforcement officer, whether it be at a protest, when being arrested, or during the execution a search warrant. That could not have been the desired result of the Sentencing Commission when using the phrase "violence or credible threats of violence" to define the eligibility of someone with no prior criminal history points for a reduction.

### C.    A Below-Guidelines Sentence Is Appropriate in This Case.

District courts may impose a sentence below the Guidelines range through either a "departure" or "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently "triggered by a prosecution request

to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation and punctuation omitted). "A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Id.* (citation omitted); *see also* USSG § 1B1.1(c).

Pursuant to 18 U.S.C. § 3553 (and specifically those portions of it that are applicable to this sentence), factors this Court is to consider in imposing the sentence, which should be sufficient, but not greater than necessary, to comply with the purposes of sentencing are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

…

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Here, Mr. Zerkle should receive a variance from the Guidelines, as the applicable § 3553(a) sentencing factors support a non-custodial sentence in this case.

### 1.    The Nature and Circumstances of the Offense.

In various sentencing memoranda concerning January 6, 2021, the Government has recognized that not all actors are equal in terms of culpability. The Government also has systemically been setting forth factors for judges to consider in relation to January 6, 2021 sentences,[5] including: (i) whether, when, and how the defendant entered the Capitol building; (ii) whether the defendant engaged in any violence or incited violence; (iii) whether the defendant engaged in any acts of destruction; (iv) the defendant's reaction to acts of violence or destruction; (v) whether during or after the riot, the defendant destroyed evidence; (vi) the length of the defendant's time inside of the building, and exactly where the defendant traveled[6]; (vii) the defendant's statements in person or on social media; (viii) whether the defendant cooperated with, or ignored, law enforcement; and (ix) whether the defendant otherwise exhibited evidence of remorse or contrition. We submit that one additional factor should also be considered: (x) whether the defendant was involved with planning or coercing the events of January 6, 2021.[7]

Mr. Zerkle never went inside the Capitol building nor tried to; instead, he left the area and started his trip home, while thousands went in the opposite direction. Accordingly, the first

---

[5] *See United States v. Reeder*, No. 21-cr-166, Gov't Sent. Mem. at 6-7 (D.E. 26).

[6] *See United States v. Morgan*, No. 21-cr-00164, Gov't Sent. Mem. at 6 (D.E. 22) (identifying location in the Capitol as a relevant factor and questioning whether the defendant entered specific areas).

[7] *See*, *e.g.*, *United States v. Morgan*, No. 21-cr-164, Gov't Sent. Mem. at 6 (D.E. 22).

and sixth factors weigh heavily in his favor. Mr. Zerkle neither engaged in, nor did he encourage, promote, or otherwise tolerate, any destruction of property or acts to injure anyone, which shows that the second, third, and fourth factors also weigh in his favor. Mr. Zerkle preserved evidence, gave photographs he took to law enforcement, and offered to provide the clothes he wore that day to law enforcement, all prior to his arrest. Moreover, he fully cooperated with law enforcement, by providing evidence, debriefing with prosecutors and agents pursuant to a debrief letter, speaking to law enforcement twice in Arizona without a lawyer present, and signing a consent to search a social media account, even though he was under no legal obligation to do so. He also did not praise the actions of January 6, 2021 in social media or when speaking to law enforcement. Again, the fifth, seventh, and eighth factors weigh in his favor. The fact that Mr. Zerkle never entered the U.S. Capitol and was regretful for what occurred that day separates him from the vast majority of January 6 defendants who have been characterized as insurrectionists or invaders.

As to the ninth factor, we suggest that the Court consider that Mr. Zerkle, from the outset, expressed a desire to accept responsibility and significant remorse for his conduct. The Government has, in other January 6, 2021 cases, acknowledged that this behavior is entitled to "significant weight."[8] Prior to even being arrested, Mr. Zerkle offered to plead guilty to a misdemeanor simple assault of law enforcement, a charge that is not routinely prosecuted in this jurisdiction anymore for resisting or impeding offenses, and which the D.C. Council tried to amend in order to decriminalize resisting or impeding, separate and apart from the Government's decision to no-paper two-thirds of all MPD related arrests in the relevant period

---

[8] *See United States v. Bustle*, No. 21-cr-238, Gov't Sent. Mem. at 6 (D.E. 38).

of the conduct in this case.

Finally, and extremely noteworthy, Mr. Zerkle was not involved with planning or coercing the events of January 6, 2021, and was not involved with any groups alleged to have been involved in the planning the events that occurred at U.S. Capitol on January 6, 2021.

### 2. Defendant's History and Characteristics, Nature of the Offense.

Mr. Zerkle is by all accounts, a hard-working, dedicated, and kind-hearted man, someone who pulled himself up from absolute poverty, with a family who loves and supports him. *See* A1-A36. As described in the numerous letters submitted, Mr. Zerkle had a difficult start in life, but nonetheless has lived a decent life of service to his family and his community, both of which care deeply about him. *Id.*

Notwithstanding the challenges he has faced, Mr. Zerkle is not a violent person and poses no danger to society, as evidenced by the Government's willingness to let him live in the community for the past two years, self-surrender when initially charged, and remain released on his personal recognizance. He has no noteworthy prior criminal convictions. Moreover, as discussed extensively above, Mr. Zerkle immediately took responsibility for his conduct and cooperated with law enforcement.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The events of January 6, 2021 were both serious and tragic, yet, as reflected above, not every actor that day has equal culpability. Is it appropriate to treat those who attended protests and left the premises the same as those who entered the building and stole or damaged property, those who organized and incited others to act, or even worse, those who injured law enforcement? To ask these questions is to answer them. The appropriate consideration under

this statutory factor is *not* whether the events of January 6, 2021 were serious (because there is no dispute that they were). Instead, the appropriate consideration is to weigh and judge *each defendant's* activities and involvement in the events of that day separately. We submit that consideration of Mr. Zerkle's conduct relative to the factors set forth above, and articulated by the Government in other sentencing memoranda related to January 6, 2021 cases, supports leniency in sentencing.

Over 1300 individuals have been charged in connection with the events of January 6, 2021, some with felonies and some with misdemeanors. Each of these cases involves a wide range of conduct, committed before, during, and after January 6, 2021, by each particular defendant. Each of these cases should be judged based on the defendant's individual conduct and not the conduct of others. Given these factors and for the reasons discussed above, a non-custodial sentence is appropriate here.

### 4.      Adequate Deterrence (Specific and General).

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences Mr. Zerkle has suffered are more than sufficient to discourage him from engaging in similar conduct. Mr. Zerkle has also grown significantly since this offense, and recognizes the importance of continuing to improve, both for himself and for his life partner, his family, and his community.

As for general deterrence, several observations can be made. *First*, the prosecution itself (and the publicity of conviction) all serve as a significant general deterrence. *See*, *e.g.*,

*Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). If that is true generally, it is especially true here.

The charges in this case received national and local press.[9] There is every indication that the public condemnation of Mr. Zerkle will continue for the foreseeable future. Unlike various other federal charges (besides other defendants in January 6 cases), no one would want to expose themselves to the level of vitriol that is being attributed to January 6 defendants — regardless of the level of their participation or the severity of their particular charges. The point of this observation is that the publicity involved in these cases itself provides significant general deterrence, unlike any run of the mill federal case. When whatever sentence this Court imposes is completed, the headlines will remain. January 6, 2021 will be a day that lives in infamy, and, for those who were charged in connection with the events at the Capitol, it will be a lifelong blemish on their record.

As a result of pushing law enforcement outside the U.S. Capitol on January 6, 2021 for mere seconds, Mr. Zerkle will suffer the consequences of two felony convictions for the rest

---

[9] *See*, *e.g.*, https://ktar.com/story/5546564/arizona-man-pleads-guilty-to-2-felonies-related-to-jan-6-capitol-breach/, last visited February 16, 2024; https://tucson.com/news/local/crime-courts/southern-arizona-man-faces-charges-in-jan-6-riot/article_f38e6732-a4b0-11ec-887d-736e4898c7c3.html, last visited February 16, 2024; https://www.azcentral.com/story/news/local/arizona/2023/10/30/arizona-man-pleads-guilty-to-shoving-officers-during-jan-6-riot/71385866007/, last visited February 16, 2024; https://www.myheraldreview.com/news/willcox/bowie-man-arrested-on-charges-related-to-jan-6-riot/article_e0a8bef4-a4a8-11ec-a1da-b7dc9e369abb.html, last visited February 16, 2024; https://bipartisanreport.com/2022/03/16/jan-6-attacker-who-punched-rammed-officers-caught-facing-10-years/, last visited February 16, 2024.

of his life. Clearly, Mr. Zerkle has already faced significant consequences for his actions and just deterrence has been imposed, especially when he never entered into the U.S. Capitol on January 6, 2021. Furthermore, while the events of January 6, 2021 were unacceptable by any measure, and must be deterred from ever occurring again, it would be inappropriate to treat every participant in that event equally, without regard to the circumstances of their involvement, and without regard to the cooperation and acceptance of responsibility they exhibited afterwards.

### 5.   Kinds of Sentences Available.

A sentence of incarceration is not always necessary in order to satisfy the sentencing mandate. Indeed, in holding that a sentence of probation was reasonable, the Supreme Court in *Gall v. United States*, cited to the district court's memorandum, which noted that probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (punctuation omitted). The district court also emphasized that the defendant would have to "comply with strict reporting conditions," and would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.*

This Court may also consider a sentence with a period of home detention, which has been defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, education or training programs, and such other times as may be specifically authorized. Electronic

monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

USSG § 5F1.2, Commentary, n.1.

Based upon the information contained in this submission, and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community service order would also satisfy the goals of sentencing. A 2001 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction," and "offers a way for the offender to repay or restore the community." Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (Feb. 2001). It is "practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Id.* It is also recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.*

In selecting an appropriate candidate to perform community service, United States Probation recommends as follows:

Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.

*Id.*

As discussed below, Mr. Zerkle requests and recommends a sentence of three years of supervision, to include home detention, community service, and restitution.

## II.    The Need to Avoid Unwarranted Sentencing Disparities.

As for Mr. Zerkle's request for a non-incarceration sentence, if those who breached the U.S. Capitol on January 6, 2021 can be afforded a second chance and probation, so too can Mr. Zerkle. Below are the names of every January 6, 2021 Capitol breach defendant for whose conduct the Government did not even seek a sentence of incarceration:[10]

| | | |
|---|---|---|
| Morgan-Lloyd, Anna | Miller, Brandon | Daughtry, Michael |
| Ehrke, Valerie | Miller, Stephanie | Juran, John |
| Bissey, Donna | Hatley, Andrew | Genco, Raechel |
| Hiles, Jacob | Pert, Rachael | Macrae, Douglas |
| Wangler, Douglas | Winn, Dana | Seymour, Paul |
| Harrison, Bruce | Wickersham, Gary | Ferguson, Jamie |
| Bustle, Jessica | Schwemmer, Esther | Fontanez-Rodriguez, Samuel |
| Doyle, Danielle | Kelly, Kenneth | Bostic, Karegan |
| Bennett, Andrew | Straka, Brandon | Bostic, Willard Jr. |
| Mazzocco, Matthew | Sizer, Julia | McFadden, Tyrone |
| Rosa, Eliel | Blauser, William | Mileur, Aaron |
| Gallagher, Thomas | Barnard, Richard | Williams, Carrie |
| Vinson, Thomas | Witcher, Jeffrey | Rutledge, Meghan |
| Dillon, Brittiany | McAlanis, Edward | Saer, Lilith |
| Sanders, Jonathan | Lollis, James | Cantrell, Eric |
| Fitchett, Cindy | Schubert, Amy | Smith, Gary |
| Sweet, Douglas | Schubert, John | Kuecken, Deborah |
| Cordon, Sean | Orangias, Michael | Traugh, Christina |
| Wilkerson, John | Quick, Michael | Culbertson, Alan Scott |
| Jones, Caleb | Reda, Kenneth | Harrison, Jeremy |
| Brown, Terry | McCreary, Brian | Ramakrishn, Karthik |
| Wrigley, Andrew | Colbath, Paul | Connolly, Kim Marie |
| Parks, Jennifer | Lewis, Jacob | Pacheco, Angelo |
| Reimler, Nicholas | Lentz, Nicholes | |

The above list does not even include all the January 6 Capitol breach defendants for whom the Government sought a sentence of incarceration at sentencing, but judges in this District refused to impose a period of incarceration:

| | | |
|---|---|---|
| Vinson, Lori | Torrens, Eric | Ryan, Jennifer |
| Griffith, Jack | Gruppo, Leonard | Stotts, Jordan |

---

[10] *See* Government's Sentencing Table of January 6 Capitol Defendants, dated February 12, 2024.

Cordon, Kevin
Abual-Ragheb, Rasha
Nelson, Brandon
Markofski, Abram
Marquez, Felipe
Mariotto, Anthony
Edwards, Gary
Tutrow, Israel
Kostolsky, Jackson
Rusyn, Michael
Sells, Tanner
Walden, Jon
Prado, Nicole
Williams, Vic
Wiedrich, Jacob
Stepakoff, Michael
Wilson, Zachary
Wilson, Kelsey
McAuliffe, Justin
Williams, Andrew
Leffingwell, Mark
Sunstrum, Traci
Gonzalez, Eduardo
Strong, Kevin
Nalley, Verden
Carico, Michael
Loftus, Kevin
Kelley, Kari
Martin, Zachary
Cudd, Jenny
Jackson, Micajah
Ivey, Bryan
Burress, Gabriel
Pettit, Madison
Fee, Thomas
Zlab, Joseph
Fox, Samuel
Hardin, Michael
O'Malley, Timothy
Rebegila, Mark
Conover, Thomas
Krzywicki, Carla
Kulas, Christian
Kulas, Mark
Von Bernewitz, Eric
Ballesteros, Robert
Peart, Willard
Spain, Jr., Edward
Chapman, Robert
Tagaris, Jody
Sywak, William Jason
Sywak, William Michael
Laurens, Jonathan
Cunningham, Christopher
Torre, Benjamin
Suarez, Marissa

Todisco, Patricia
Persick, Kerry
Buckler, Matthew
Cavanaugh, Andrew
Ortiz, Christopher
Homer, Lisa
Fracker, Jacob
Thurlow, Steven
McNicoll, Lois Lynn
Youngers, Darrell
Vollan, Cody
Carollo, Anthoy
Bratjan, Frank
Ferreira, Leticia
Connor, Francis
Ferrigno, Antonio
Lunyk, Anton
Vincent, Reva
Ayres, Stephen
Hentschel, Cara
Munn, Dawn
Munn, Joshua
Munn, Kayli
Munn, Kristi
Munn, Thomas
Munger, Jeffrey
Rodean, Nicholas
Mels, James Allen
Clark, Christy
Clark, Matthew
Spigelmyer, Paul
Uptmore, James
Brooks, James
Yazdani-Isfehani, Abigail
Yazdani-Isfehani, Loruhamah
Comeau, Jason
Evans III, Treniss
Castle, Trudy
DiFrancesco, Kimberly
Wood, Matthew
Wiersma, David
Frankowski, Dawn
Buxton, Jonas
Billingsley, Steven
Gross, Juliano
Council, Matthew
Johnson Jr, Thaddis
Bond, Stacy Lee
Conlon, Paula
Witzemann, Shawn
Slaeker, Tyler
Montalvo, Matthew
Gable, Levi
Faulkner, Luke
Javid, Iraj
Lanham, Melanie

Gleffe, Marcos
Heathcote, Chad
Manwaring, Susan
Bustos, Alexis
Bustos, Bryan
Myers, Rachel
Grover, Logan
Cramer, Country
Gordon, Vaughn
Gerwatowski, Eric
Ambrose, Lawrence
Tilley, Todd
Montoya, Samuel
Weibling, Adam
Cronin, Kevin
Massie, Kenneth
Hallon, Luis
Gould, John David
Jones, Brian Raymond
King, Patrick John
Horvath, Ian
Gerding, Christina
Gerding, Jason
Bokoski, Bradley
Bokoski, Matthew
Chiguer, Stefanie
Cohen, Menachem
Temple, Cole Andrew
Smith, Justin Michael
Greene, Michael
Hart, Timothy Allen
Gallman, Joei
Gallman, William
Isaacs, William
Parker, Sandra
Parker, Bennie
Machacek, Brennen
Schulz, Kenneth
Etter, Jeffrey
Hellonen, Dodge
Llamas, Saul
Messer, Walter
Siemers, Jordan
Coomer, Micah
Abate, Joshua
Preller, Brian
Yavoich, Andrew
Dodge, Russell
Krauss, David
Krauss, Nicholas
Ardolino, Vincent
Cotton, William
Weyer, Conlin
Chang, Julio C

Other sentences for conduct far worse than Mr. Zerkle's have resulted in far less incarceration than the Government is seeking in this case.

For example, in *United States v. Donnie Wren*, No. 21-cr-599-RBW, this Court sentenced the defendant to one year and a day of incarceration following a jury trial, where the defendant was convicted of assault of law enforcement, civil disorder, and entering and remaining on restricted grounds. According to the Government's press release following sentencing, Mr. Wren attended the Trump rally on the Mall with his cousin, Harlen Smith and then they both:

> made their way toward the U.S. Capitol building. Before entering Capitol grounds, Smith climbed a column near the African American History Museum with the outdated Mississippi state flag. Smith and Wren arrived on the restricted Capitol grounds and observed other rioters climbing scaffolding erected around the stage for the Presidential Inauguration. The two then climbed the structure and made their way to the Lower West Terrace Tunnel. . . . [Smith and Wren . . .] posed for a photograph together on the Lower West Terrace. Smith and Wren then climbed up a railing to the Upper West Terrace and confronted a line of police officers using riot shields and attempting to clear the area. Smith and Wren pushed back against the police line, placing their hands on the officer's shields and leaning back into the police. Wren leaned all his weight into the riot shield, preventing the police officer from advancing. Wren's push against the riot shield was an early assault on the Terrace that instigated the fight between rioters and police attempting to clear the area.

DOJ Press Release, https://www.justice.gov/usao-dc/pr/two-men-mississippi-and-alabama-sentenced-actions-during-jan-6-capitol-breach, last visited February 15, 2024.

In its sentencing memorandum (No. 21-cr-599-RBW, D.E. 158 at 7-10, 23), the Government described how Mr. Wren: (i) committed "an early assault on the Terrace that instigated the fight between rioters and police who were attempting to clear the Terrace," (ii) "trespassed on Capitol grounds for over two hours"; (iii) lied to law enforcement about

pushing police; and (iv) after his trial, described police "brutally beating and killing our fellow patriots" at the Capitol and that the search warrant in his case was based on lies. Mr. Wren also had multiple criminal history points that placed him in Criminal History Category II. In response, the Government asked for a sentence of 51 months of incarceration.

This Court applied the guidelines for civil disorder, thereby further reducing Mr. Wren's applicable guidelines range, and sentenced Mr. Wren to a year and a day. If the same was applied to Mr. Zerkle, his guidelines range would be 8 to 14 months and he would be Zone B eligible, regardless of whether this Court gave Mr. Zerkle a two-level reduction for being a zero-point offender, which would further reduce his advisory guidelines range to 4 to 10 months.

Unlike Mr. Wren, Mr. Zerkle never went even to the steps of the U.S. Capitol, and he made no social media comments about January 6, let alone seeking to undermine the lawfulness of his case or misrepresenting the actions of law enforcement officers at the Capitol. His conduct was primarily motivated by his concerns for his brother and he did not lie to law enforcement. Instead, he gave full cooperation, by debriefing with the Government, accepting responsibility for his actions, and offering to enter into a misdemeanor assault plea before he was even arrested.[11]

---

[11] The conduct alleged in this case, if proven beyond a reasonable doubt at trial, would not rise above misdemeanor simple assault under the D.C. Code. Felony assault of an officer under D.C. Code § 22-405(c) requires "significant bodily injury" or "a violent act that creates a grave risk of causing significant bodily injury." No such conduct occurred in this case and the Government does not assert otherwise. Even if the U.S. Attorney's Office actually papered a charge based on a resistance theory (which the D.C. Council is actually trying to remove from as a basis of criminal liability), the U.S. Attorney's Office would have permitted Mr. Zerkle to be eligible for a Deferred Prosecution Agreement or a Deferred Sentencing Agreement. And, even if such diversion, which is routinely offered, was not offered, Mr. Zerkle would have almost certainly received a probationary sentence if convicted under the current sentencing

Examining other sentences of January 6 defendants highlights why a non-incarceration sentence in this case would avoid a sentencing disparity.

- *United States v. Daryl and Daniel Johnson*, No. 21-cr-407-DLF (sentencing father and son on civil disorder offenses to four and one month sentences, respectively, when they "entered the Capitol building . . . by climbing through a broken window next to the Senate Wing Door. They remained in the building for approximately 26 minutes, making their way to the East Rotunda doors. There, they . . . rushed the line of officers and helped push open the East Rotunda doors, allowing rioters outside to enter. Both posted on social media afterwards. Daniel Johnson messaged a friend on Snapchat on Jan. 6 that he was 'one of the first ones inside.' On Jan. 7, Daryl Johnson posted on Facebook that 'if [we] can get 50+ year old men and women upset enough to spend thousands of $ to come to a rally what happens when those same people decide to throw out the 'elected officials.' It will be hangings on the front lawn of the capitol . . .'"), https://www.justice.gov/usao-dc/pr/father-and-son-plead-guilty-felony-charges-offenses-committed-during-jan-6-capitol-breach, last visited February 16, 2024.

- *United States v. Kenneth Grayson*, No. 21-cr-224-TSC (sentencing defendant to sixty days of incarceration for civil disorder where he "entered the Capitol through the Senate Wing doors at approximately 2:20 p.m. and proceeded to the Crypt. He also entered the Rotunda area, where a mob of rioters began standing in front of a row of law enforcement officers. The mob began pushing against officers to gain access to the adjoining hall. Grayson joined the rear of this group that began pushing into the officers. While he was inside the Capitol, Grayson live-streamed video on his Facebook account."), https://www.justice.gov/usao-dc/pr/pennsylvania-man-sentenced-actions-during-jan-6-capitol-breach, last visited February 16, 2024.

- *United States v. Andrew Griswold*, No. 21-cr-459-CRC (sentencing defendant to 75 days of incarceration for civil disorder where he breached the Capitol, recorded video inside, joined a group of protestors pushing against officers who were shouting, "Heave! Ho!, and gave statements to the press after leaving about taking the building, while issuing a warning to Democrats to "back off, this is our country, we are willing to do whatever it takes to keep it . . . We showed 'em today. We took it. They ran. And hid.")

---

practices and statistics in that Court. Here, in this case, the Government charged Mr. Zerkle with three separate felonies for purportedly resisting three separate officers, each with a maximum period of incarceration of eight years and a felony civil disorder charge based on the same alleged conduct.

Accordingly, to avoid unwarranted sentencing disparities, Mr. Zerkle should receive a non-incarceration sentence.

### III.    The Government's Sentencing Memorandum and Sentencing Recommendation is Not in Conformity with the Statutory Sentencing Factors.

A cursory review of the Government's Sentencing Memorandum and Sentencing Recommendation (D.E. 82) reveals that it is not in conformity with the statutory sentencing factors and appears to be based on certain misstatements. In a blatant failure to evaluate the § 3553 factors, the Government devotes just three lines of its 28-page sentencing memorandum to Mr. Zerkle's "history and characteristics," Clearly, Mr. Zerkle, as a person, matters very little to the Government and, in the mind of the Government, he is just another insurrectionist, even though he never even went into the Capitol on January 6. The Government's purported sentencing comparators (*see* Gov't Sent. Mem. at 25-26) are not even close to the facts of this case. Pushing officers for a brief moment to help secure the safety of one's brother cannot be equated to striking an individual with a skateboard or punching and kicking another officer and knocking him to the ground.

While the Government has a compelling obligation to prosecute those involved in the events of January 6, 2021, in doing so, it cannot lose its perspective and forget its obligations to be just, fair, and consistent during the process.[12] In its sentencing memorandum, the Government makes no mention, let alone, acknowledgement that Mr. Zerkle:

---

[12] As Mr. Zerkle never entered the Capitol to stop the certification of the election, he is not an insurrectionist or invader. Allowing the Government to seek three years of incarceration for charges of impeding or resisting law enforcement during a protest creates a dangerous precedent for other protest-related resistance where no physical injury occurs. Regardless of the political ideology, the purpose of the protests, or those involved, this country has recently seen very violent encounters with law enforcement that have often gone unpunished to the level in this case. *See*, *e.g.*, https://www.forbes.com/sites/anafaguy/2023/11/16/6-cops-and-

- Never entered the U.S. Capitol or tried to do so;
- Did not punch or kick a law enforcement officer, have a weapon in his possession, or attempt to use any object as a weapon;
- admitted his conduct to law enforcement *prior to* his arrest;
- provided all the evidence implicating himself that he could *prior to* his arrest;
- self-surrendered in Arizona after being notified of the warrant;
- has been 100% compliant with his supervision requirements for over two years;
- has not been involved in any drugs or contacts with the criminal justice system since his arrest in this case; and
- has maintained steady employment.

In the introduction to its sentencing memorandum alone, the Government incorrectly asserts that Mr. Zerkle "marched to the Capitol from the National Mall with members of the Proud Boys and eventually entered onto the west front of the Capitol grounds." *Id.* at 2. The

_____

90-protesters-injured-outside-dnc-in-clashes-over-israel-hamas-war-police-and-protest-group-say/?sh=6cfbb1265a4a, last visited February 16, 2024 (describing six Capitol Police officers assaulted and injured in response to pro-Hamas protests outside the Democratic National Committee headquarters while Congressional members were inside on November 16, 2023); https://www.jpost.com/international/article-771751, last visited February 16, 2024 (describing an assault outside the White House, which required White House staffers to relocate); https://www.kiro7.com/news/local/thousands-gather-capitol-hill-solidarity-with-demonstrations-portland/STVDEK5XUJHWLL2HQZT2NWDYVY/, last visited February 16, 2024 (identifying 55 officers injured after protests turned violent with trailers set on fire, windows at businesses smashed, cars damaged, and explosive devices thrown at police); U.S.S.S. Press Release, https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0, last visited February 16, 2024 ("More than 60 Secret Service Uniformed Division Officers and Special Agents sustained multiple injuries from projectiles such as bricks, rocks, bottles, fireworks and other items. Secret Service personnel were also directly physically assaulted as they were kicked, punched, and exposed to bodily fluids. A total of 11 injured employees were transported to a local hospital and treated for non-life threatening injuries."); https://www.nbcwashington.com/news/local/protesters-gather-in-dc-for-2nd-day-in-response-to-george-floyds-death/2317512/, last visited February 16, 2024 (detailing eleven MPD officers injured in one single evening); https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf, last visited February 9, 2024 (identifying at least 2000 injured offices nationwide from contributing data from police associations — excluding Washington, DC, which withheld data — from May 25, 2020 through July 31, 2020 from protests).

Government cannot even bring itself to concede obvious facts, specifically, that Mr. Zerkle came to D.C. with his brother and knew none of the other protestors that day. The fact that he was in a large group of people that included some Proud Boys, whom he did not know, is of no significance. The defense, which has no obligation to explain any evidence to the Government, has highlighted that video footage (produced by the Government) shows Mr. Zerkle leaving the large group of people by the Peace Circle, proceeding up the Mall toward the Washington Monument, and walking back to the Capitol with his brother much later, unequivocally confirming that Mr. Zerkle did not take any action with the Proud Boys at the Capitol. Yet, the Government refuses to correct the record and persists in raising the same false point in its sentencing memorandum as it intended to at trial, apparently in the hope that this will somehow paint a picture that Mr. Zerkle is someone that he is not.

Moreover, although this Court ruled that the offenses of conviction grouped, as confirmed by U.S. Probation, the Government disregards that order and just proceeds in its sentencing memorandum as if this Court's decision never occurred. The Government asks for a sentence above the guidelines range as determined by the Court and U.S. Probation, which constitutes an upward variance in violation of the plea agreement and in violation of U.S. Attorney's Office policy that such a request must be approved by the Office's Departure Committee. In the midst of an epidemic of violent crime in the District, the Government should be devoting its focus, time, and resources elsewhere, rather than perusing frivolous arguments and claims.

Apparently to the Government, none of this matters. Rather, Mr. Zerkle automatically deserves above the top of the guidelines as contemplated by the Court and U.S. Probation.

Sentencing does not operate in this matter and the exercise of prosecutorial discretion should not operate in this manner.

## IV.     Sentencing Request and Recommendation.

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, as are relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c). Accounting for these factors, as addressed above, Mr. Zerkle recommends a three-year period of supervision including the "standard" conditions recommended by the Guidelines. *See* USSG § 5D1.3(c). The conditions of supervised release will significantly restrict Mr. Zerkle's liberty and provide a daily reminder of his criminal conduct by requiring that he, among other things:

- regularly report to his probation officer;
- seek permission from the Court or his probation officer to leave Arizona;
- respond truthfully to questioning by his probation officer;
- live in an approved residence and notify his probation officer of any address change;
- allow his probation officer access to his residence;
- work fulltime and notify his probation officer of any job change;
- refrain from knowingly communicating with criminals;
- notify his probation officer if he is arrested;
- refrain from possessing a firearm or other dangerous weapons; and
- refrain from possessing illegal drugs or alcohol.

A three-year period of supervision, subject to these conditions, will provide adequate punishment and deterrence while allowing Mr. Zerkle to remain a productive member of

society. A ninety-day period of home detention would also act as a deterrence for any future

conduct similar to the offense conduct in this case.[13]

## CONCLUSION

For the foregoing reasons and others that may appear to the Court or may develop at

the sentencing hearing, Mr. Zerkle respectfully requests that this Court impose a sentence of

three years of supervision, with a period of home confinement, in addition to the mandatory

restitution of $2,000 to the Architect of the Capitol.

Dated: February 16, 2024

Respectfully submitted,

**SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

   /s/ Christopher Macchiaroli
Christopher Macchiaroli (D.C. Bar No. 491825)
1750 K Street, NW, Suite 810
Washington, D.C. 20006
Telephone: (202) 539-2444
Facsimile:  (410) 547-2432
Email: cmacchiaroli@silvermanthompson.com

Emma J. Mulford (Bar No. MD0146)
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-6249
Facsimile: (410) 547-2432
Email: emulford@silvermanthompson.com

*Counsel for Defendant Jacob L. Zerkle*

---

[13] Regarding restitution and assessments, as set forth in the PSR, Mr. Zerkle does not have the ability to pay a fine in addition to the mandatory restitution in this case. This Court should not impose a fine because neither Mr. Zerkle nor his farm generate any income, he has limited financial assets, and he was found to be entitled to court appointed counsel in this case.